## SCHNEIDER v. DUFFY et al.

District Court, D. New Jersey.
Sept. 17, 1930.

Arthur T. Vanderbilt, of Newark, N. J., for plaintiff.

Phillip Forman, U. S. Atty., of Trenton, N. J., Anthony Giuliano, Asst. U. S. Atty., of Newark, N. J. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and J. A. Rees, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for defendants.

RUNYON, District Judge.

This action was instituted to recover from the above-named defendants, individually and separately, the respective sums of $28,010.38, $12,728.58, and $5,000, alleged to have been erroneously overpaid to them as collectors of internal revenue by Anthony Schneider, the above-named plaintiff, in settlement of his individual income taxes for the calendar years 1918 to 1921, both inclusive.

The Revenue Acts of 1918, 1921, 1924, and 1926 (40 Stat. 1057; 42 Stat. 227; 43 Stat. 253; 44 Stat. 9), are those under and by virtue of which this action is brought, and plaintiff brings it in this court because of the fact that his claims for a refund in the premises have been rejected by the tribunals provided by the Revenue Acts to assume original cognizance thereof and his consequent desire to obtain a judicial determination of the matter in difference upon its merits.

By stipulation of the parties the case has been tried by the court without a jury.

This plaintiff, together with one Richard M. C. Glenn, whose situation with reference to alleged overpayments was altogether similar, during the earlier stages of their controversy with the government, had appealed from the Income Tax Unit of the Bureau of Internal Revenue to the Board of Tax Appeals, and this latter body, as a part of its consideration of the cases' issued its "Findings of Fact," which are next hereinbelow set forth in part, as a fair statement of the circumstances attending the execution of the contract between plaintiff and Seidenberg & Company, Inc., and which deal with a vital part of this case:

"Findings of Fact:

"For many years prior to March 1, 1916, both taxpayers were vice presidents of Seidenberg & Co., Inc., and of the American Cigar Co., and had been instrumental in developing the business of manufacturing and selling the Roi-Tan Cigar. Seidenberg & Co., Inc., was a subsidiary of the American Cigar Co. The taxpayers planned to sever their connection with the two named companies and to engage in an independent and competing business. Sylvester, the president of the two companies, entered into negotiations with the taxpayers to induce them to remain as vice presidents of the companies in which he was interested. The negotiations

resulted in contracts being executed by each of the taxpayers with Seidenberg & Co., Inc., under date of March 1, 1916, each contract being identical in terms.

"The taxpayers each received dividend checks regularly on the basis of ownership of 1,500 shares of stock. They signed proxies for all meetings of stockholders and their proxies were recognized at all stockholders' meetings.

"The taxpayers each received certificates for 300 shares of stock on March 1, 1917, and on March 1 of each year thereafter they each received certificates for 300 shares until certificates for the full 1,500 shares were respectively received.

"The taxpayers continued to serve as vice presidents of both companies during the years 1916 to 1921, inclusive, and received salaries during that period equal to the salaries paid to other vice presidents of the companies. On at least two occasions during the period the taxpayers received increases in salary.

"The Commissioner treated the receipt of certificates for 300 shares of stock in each respective year as equivalent to the receipt of income for that year to the extent of the value of the stock at the time of the receipt of the certificates. He also treated the dividends received upon the undelivered stock in each year as additional salary for that year, and subjected it to both the normal and surtax rates for each year of receipt."

In addition to these findings, the evidence presented at the trial shows that when Messrs. Schneider and Glenn, who for many years had served as vice presidents of both Seidenberg & Co. and of the American Cigar Company, determined to withdraw from these companies and launch a new tobacco business, Mr. Sylvester, president of the American Cigar Company, approached them with a proposition to which they finally agreed, and as a result of which they surrendered their plan of independent operation, and agreed to remain with Seidenberg & Company and the American Cigar Company.

Mr. Sylvester's proposition, sanction for which he obtained from the board of directors of the American Cigar Company, was, acting through Seidenberg & Co., a subsidiary corporation, to give to Messrs. Schneider and Glenn an interest in the parent company of $150,000 each of common stock; this being in consideration of the altered courses of action agreed to by these gentlemen, and the services to be rendered by them under such altered arrangement.

The practical result of this agreement, and the interpretation placed upon its terms by the parties, would seem to be shown most clearly in the circumstances recounted in the findings of the Board of Tax Appeals, viz., that after the execution of the contract, Messrs. Schneider and Glenn received regular stock dividends on the basis of ownership of 1,500 shares of stock, and that they executed proxies on the same basis of ownership, which were duly recognized at all stockholders' meetings during the period of installment deliveries of stock certificates.

As a further showing of the apparent intent of all parties, the evidence discloses the fact that in December, 1920, or thereabouts, plaintiff received a 50 per cent. stock dividend on 1,500 shares of stock.

The features appearing in this matter which have led to the present stoutly contested passage at arms are: First, that Seidenberg & Co., between which company and the plaintiff the contract was made, did not transfer to Mr. Schneider 1,500 shares of American Cigar Company common stock when the contract in question was executed, but divided said transfer into five equal parts and conveyed to him regularly thereafter at yearly intervals a one-fifth portion, viz., 300 shares; and, secondly, that the plaintiff himself gave a practical construction to his contract, wholly at variance with his present contention, when in his tax returns for the years 1918, 1919, 1920, and 1921, he incorporated 300 shares of stock as income received by him in *each* of these years.

As bearing upon the second of these features, it is pertinent to recall that on the stand, Messrs. Schneider, Sylvester, and Glenn all testified that the consideration for the entry of Schneider and Glenn into the contract was the agreement on the part of the contracting company to transfer to each $150,000 worth of common stock. Schneider and Glenn agreed to do certain things in return for that transfer, and so far as they could carry out their agreement, lacking the passage of time, they complied strictly with the promises made by them in the contract. In other words, they abandoned the plan to start in a competitive business, and they continued in the employ of, and as officers of, the American Cigar Company and of Seidenberg & Co.

And since it cannot be assumed that Mr. Schneider was insensible of the fact that he was receiving and accepting dividends on the

full amount of $150,000 worth of stock, it must follow that he was fully cognizant of the company's interpretation of the meaning of the contract also, and realized that there had been a definite dedication of 1,500 shares of stock to his purposes in carrying out the terms of the contract, and, furthermore, as set forth in the contract, that there was a provident holding by the company of a portion of the physical evidences of interest, viz., the certificates as collateral security until the passage of time, from period to period, should constitute and prove a further and further fulfillment by Mr. Schneider of his obligations under the contract, and entitle him to the full delivery thereof.

It may well be that Mr. Schneider failed to apply correct names to various contributing factors entering into his financial affairs and claiming attention in connection with income tax matters. It may be altogether true that he regarded each annual installment of stock, transferred pursuant to the contract, as so much income for that year.

■ Granted that all this be so. If, in such matters, Mr. Schneider has in good faith erred, and if the result of such error is to give the government an increase to which it would not have been entitled, had every factor been accorded its true worth and weight as provided in and by the statutes, and if within the time and in the manner prescribed by law, the error is sought to be corrected, Congress has by statute provided ways and means therefor and thereby indicated its intent that whether or not a taxpayer's overpayments are due to a mistake of fact or a mistake of law, the government stands ready to return any overcharge so paid in error.

It therefore appears to me that Mr. Schneider's seeming acquiescence in considering each 300-share installment of stock certificates as income for the current year, when taken and considered in connection with his actions in matters and features much more intimately connected with the contract which is the basis of this whole controversy, is by no means determinative, and that justification for the defendant's contention, if any there be, must arise out of some factor naturally falling within the scope of the first feature above mentioned.

That has to do with the mode and manner of the delivery of the stock certificates and means the determination of the question as to whether or not the beneficial interest in the 1,500 shares of stock vested in the plaintiff at the time the contract was executed,

or from time to time as the installment shares were actually delivered to him in the following years.

■ An inspection and study of the contract between the various contracting parties is illuminating in this connection.

For instance, the first paragraph thereof sets forth that Mr. Schneider undertakes to give his whole time and best efforts in behalf of Seidenberg & Co. and the promotion of its business "at least until March 1, 1921, upon the condition, and only upon the condition that he is continued in no lower official position with party of the first part than he now enjoys, and without reduction of regular salary, and that he is continued Vice-President of the American Cigar Company, with like bonus from year to year as other Vice-Presidents have; party of the second part contemplates continuing thereafter in the service of said party of the first part, but limits his absolute obligation as aforesaid. * * *"

The clear intent of this paragraph seems to be to treat the 1,500 shares of stock as something entirely separate and apart from salary or any addition thereto. The stock transaction is evidently satisfactory to the parties, and of itself constitutes sufficient consideration for the alteration of Mr. Schneider's plans to leave his employers, but he doesn't propose to assume any lower official position in either company or accept any reduction of regular salary during the term of the contract because of such transfer of stocks to him.

In another part of the contract Mr. Schneider is represented as anxious to have a direct and continuing interest, not only by way of monetary salary, but also in the stock of the controlling company, and this thought of itself stresses the idea that the stock transaction and the salary question were divorced.

Again, the statement in said contract contained that the "party of the second part contemplates continuing thereafter" (i. e., after the specific term of the contract) "in the service of the said party of the first part" further serves to accentuate the idea that the stock was not to be treated as additional salary, for, if it were, a thoroughly indefinite state of affairs would be bound to succeed the expiration of the contract term.

The stock would have been delivered in its entirety. The terms and conditions of the contract would concededly have been fulfilled by all parties, and under some other terms and conditions, we know not what, but cer-

tainly not including any annual allotment of 300 shares of stock as additional salary, Mr. Schneider would be ready to continue the contract of hiring for some unknown period.

That it was not a contract for additional salary may be further gathered from the language of the second paragraph of the contract wherein occurs the following:

"As an inducement to the foregoing covenant by party of the second part, and in lieu of additional salary to him for said five years' service, and the service hoped for and expected by party of the first part after the termination of said five years, party of the first part hereby conditionally assigns to party of the second part an equitable ownership in 1,500 shares of common stock of the American Cigar Company out of 3,000 shares of said stock this day equitably acquired by party of the first part."

There are two features at least from which the intent to treat the stock as something apart from additional salary may be spelled. In the first place, the stock is to be assigned *"in lieu of* additional salary," not *as* additional salary, but *as a substitute for,* or *in place of* additional salary—a distinctly indicated difference. And, secondly, this stock is not of necessity to serve in lieu of additional salary for the service to be rendered during the five-year term of the contract, but also for the service hoped for and expected after the termination of said five years. In other words, there is not the precision in this arrangement which would naturally be sought and expected in a contract fixing the rate and amount of salary, but a transfer of a definite amount of securities in return for an altogether indefinite amount of service, the minimum thereof alone being specified.

The testimony further shows that during the term of Mr. Schneider's employment, and during the operation of the contract, he received increases in his salary, which would not have been the case, it seems reasonable to infer, if the question of additional salary had been taken care of through the stock operation and consisted of its installment transfer to him.

The transfer to Mr. Schneider, according to the language of the contract, consisted of the conditional assignment to him of the "equitable ownership in 1,500 shares of the common stock of the American Cigar Company * * * this day equitably acquired by party of the first part."

On divers subsequent occasions Seidenberg & Co. made delivery of installment shares of stock to Mr. Schneider, and the record fails to disclose any further vesting of title in the contracting company as a basis for such deliveries.

It may well be the case therefore that Seidenberg & Co. had more than an equitable title from the outset, but from the language employed in the contract, whatever its interest may have been, Seidenberg & Co., in transferring to Mr. Schneider the entire 1,500 shares, assigned to him all the interest in such stock which it possessed.

And with these 1,500 shares of stock so assigned to him, it becomes pertinent to inquire as to what the extent of Mr. Schneider's interest was therein.

It cannot be maintained that actual physical possession is a necessary incident to the vesting of property.

The general principle is quite to the contrary and holds that an interest in property is vested when there is a present fixed right to the enjoyment of the income from, or increment of, the property.

Fletcher on Corporations, vol. 5, p. 5604, § 3426, contains the following with reference to the ownership of stock and the possession of certificates evidencing such ownership:

"Certificate is not the stock itself. It is well settled that a certificate of stock in a corporation is not the stock itself. It is the mere evidence of the holder's ownership of the stock and of his rights as a stockholder to the extent specified therein, just as a promissory note is merely the evidence of the debt secured thereby, and as title deeds are merely the evidence of the ownership of land. 'A share of stock in a corporation consists of a set of rights and duties between the corporation and the owner of the share. These rights and duties are in fact and law quite distinguishable from the certificates and the power to transfer those rights and duties. The certificate is evidence that the person therein named possesses those rights and is subject to those duties, but it is not in law the equivalent of those rights and duties. They are *muniments of title, but not* the title itself; much less the real property. The fact that certificates of stock are handles in everyday commerce and treated as stock itself does not alter the fact that it is merely the representative of the stock and the evidence of ownership. There may possibly be a value in the certificate itself apart from the value of the stock which it represents. On the same theory that there may be a value in the title papers to other kinds of property

apart from the value of the property itself to which they relate. But that value is only estimated in the light of the convenience of such papers as evidence. If a party wrongfully obtains or retains possession of such papers, the owner of the property might have his action to recover their possession or damages for their detention; but such damages, if recovered are no part of the value of the property to which the title papers relate. And no one could maintain such a suit, except the owner of the property. Ownership of the title papers is incident only to ownership in the property.'"

It would appear, therefore, that when the equitable ownership of the 1,500 shares of stock was transferred to Mr. Schneider on March 1, 1916, he became the owner of all of said stock at that time despite the fact that the certificates, "mere evidence of the holder's ownership of the stock and of his rights as a stockholder to the extent specified therein," were not delivered into his possession.

That the intent of the parties was to transfer ownership of 1,500 shares of stock to Mr. Schneider at the outset of the contract term is again shown in this language appearing in the contract:

"Party of the second part (plaintiff) shall be entitled to receive and enjoy all dividends declared and paid from the date hereof on all of said 1,500 shares. * * *

"The obligation on party of the first part to pay or cause to be paid to party of the second part all dividends paid on the undelivered portion of the $150,000, of stock hereby conditionally assigned, shall extend not only to ordinary dividends, but to any distribution, whether of money, property, stocks or rights that the common stockholders of American Cigar Company become entitled to, and shall apply to all stock undelivered at the time such right accrues."

The broad sweep of the rights transferred to Schneider herein makes it very evident that the only thing withheld from his acquirement of complete domination in the premises was the physical possession of the evidence of his ownership, viz., the stock certificates, and the conditions attending such withholding and the later transfer thereof, imposed as they were by the assigning company, constituted conditions subsequent to the inception and execution of the contract, and the vesting of ownership in Mr. Schneider serving merely as collateral security to the company for Schneider's faithful performance of his obligations, and conditions which could be met only by the passage of time.

In other words, the parties recognized that the obligation imposed upon the company was one which, so far as the $150,000 worth of stock was concerned, the company could discharge in its entirety at the very outset of the contract term; whereas, the obligation of Schneider was of such nature that the entire term of the contract must needs pass before his performance could come to a conclusion.

Hence the insertion of the "collateral security" clause, and of the condition that if the stock were not paid for in the coin of continuous and faithful service for the full term of the contract delivery of any portion of said stock certificates representing such portion of said contract term as should show a failure on Schneider's part to perform should be withheld, and Schneider divested of ownership thereof.

The company's position and intent in the matter, as above indicated, is shown in the following excerpt from the contract.

"If in the meantime, party of the second part dies or voluntarily and definitely breaches the obligation entered into by him and set out in the next preceding paragraph hereof, then the obligation to make further deliveries shall cease, except that if such death or voluntary and definite refusal to carry out such obligation ceases at some time other than on March 1st, stock shall be delivered pro rata, upon the happening of such death or breach of obligation, counting the period by months. * * *

"The right preserved to party of the first part to decline to make further deliveries upon the voluntary and definite refusal of party of the second part to carry out his obligation set forth in the next preceding paragraph hereof, is intended only as collateral security to party of the first part, and is by no means intended to permit or authorize party of the second part to disregard the obligation set out in the next preceding paragraph thereof, with only the penalty of thereby forfeiting his right to the then undelivered stock."

The transfer of the certificates, step by step, appears to me a further confirmation of the idea that ownership thereof vested in Schneider at the outset of the contract term. Seidenberg & Co. had received an assignment of 1,500 shares of the common stock of the parent company, conveyed with no provision, express or otherwise, that any

beneficial rights should rest in said assignee. The obligation resting upon Seidenberg & Co. was merely to hold these certificates for periodical delivery to the plaintiff and to make such deliveries at stated periods. The fact that the American Cigar Company has divested itself of any beneficial interest in the stock; that Seidenberg & Co., acting as a depository only, had in the language of the contract transferred all the rights of ownership in the entire 1,500 shares of stock to Schneider, subject only to the provisions above quoted, which in reality consituted nothing more nor less than a bond for faithful performance, and went no further than to stipulate in effect that, reckoning in yearly periods, just as long as Mr. Schneider remained alive during the contract term and committed no voluntary breach of said agreement, proportionate blocks of stock certificates should be turned over to him. In other words, all that Mr. Schneider had to do to acquire complete domination in the situation was to stay alive and do what he had promised.

In the meantime, it is true, he had no right to sell the undelivered portions of stock. But he had all the beneficial rights therein, and that is more than either the American Cigar Company or Seidenberg & Co. had, so long as Schneider remained alive and true to his obligation.

In our own Third Circuit, as set forth in 29 F.(2d) 834, appears the case of Saunders v. Commissioner of Internal Revenue, wherein Saunders, an inventor, had made an assignment of his invention to his employers in the year 1911. On account of delays of various sorts, the patent was not issued until 1918, and it was in September, 1920, that the employers paid Saunders for his device. the sum of $25,000. A difference arose between Saunders and the Tax Board as to this sum, Saunders claiming it to be the consideration for his 1911 sale, whereas the Tax Board held that it was income for the year 1920 when it was received.

Judge Buffington delivered the opinion of the court, a portion of which reads as follows:

"As all parties disclaim the thought that the $25,000 was a gift or gratuity, it is clear that Saunders' right to it initially arose, by virtue of the company's rule, when Saunders made the absolute transfer in 1911. To our mind all that was afterwards done harks back to that date. Saunders' right and property was the invention he made, and the right to such an invention is property and is assignable. Stevenson v. Shalcross (C. C. A.)

205 F. 289. Hendrie v. Sayles, 98 U. S. 549, 25 L. Ed. 176, in which latter case it is said: 'Such an assignment may be made before the patent is obtained. * * * Such an instrument, though executed before the patent is granted, transfers the legal title to the assignee,' quoting Gayler v. Wilder, 10 How. 477, 13 L. Ed. 504; Rathbone v. Orr, Fed. Cas. No. 11,585, 5 McLean, 131; Rich v. Lippincott, Fed. Cas. No. 11,758, 2 Fish. Pat. Cas. 1, etc. From this it will be seen that the subsequent prosecution of the patent application, the interference litigation, the issue of the patent, and the determination by the tube company of 'the amount depending on circumstances' which it would pay him, were mere incidents; but the payment when finally made was the real consideration of the transfer of his property made in 1911. Such being the case, and this transfer antedating the income law, it follows that when Saunders received the $25,000 in 1920, he was receiving, not income for that year, but the purchase price of capital sold in 1911. Such being the case, it follows the Board was in error in assessing this tax as income."

Applying the principle enunciated in this case to the one under consideration, it seems plain that Mr. Schneider became the beneficial owner of the entire 1,500 shares of stock on March 1, 1916, the date upon which the contract between Schneider and Seidenberg & Co. was executed.

The case of Platt v. Bowers (D. C.) 13 F.(2d) 951, is another one possessing some points of similarity with that under consideration.

In that case the plaintiff had, in 1909, contracted to sell and surrender his rights to renewal premiums on policies previously written by him, said premiums aggregating $150,000, and the consideration therefor being payable at the rate of $10,000 per year until 1924, the plaintiff in the meantime agreeing to refrain from entry into the insurance business.

The government regarded the $10,000 annual payments of interest as income for each respective year as received. The District Court judge, on the other hand, held that when the contract was made there was an absolute promise to pay a definite sum of money, in exchange for which the plaintiff surrendered his right to renewal premiums. If there had been no contract, and the plaintiff had been in yearly receipt of $10,000 from renewal premiums, that amount would certainly have been properly treated in each instance as income for the current year; but, the court held, the contract trans-

formed this indefinite right into an obligation to pay a definite and certain sum, and while the payments were stretched over a period of years, this fact did not serve to constitute the annual payments as taxable income for the year of such payment.

In this case and in the one under consideration there was a surrender of right to work independently, a right which apparently had an assured but wholly indefinite value, in exchange for a promise to pay a definite sum in installments. The cases are largely alike on this point, and the Platt Case upholds the principle that the mere fact of installment payments in no wise supports the theory of income from year to year to the extent of such payment.

From all of the foregoing I am drawn to the conclusion that the $150,000 of stock constituted income to Mr. Schneider in 1916, when the contract was made, and that the subsequent installment deliveries of stock, made from year to year, being nothing more than evidence of an ownership already vested, in no wise constitute taxable income for such years as *saw* their physical delivery to the plaintiff.

Equally am I persuaded that the evidence supplied by plaintiff, in his endeavor to make clear any ambiguities which attended the making of the contract or its wording, was warranted in this present matter, being a case of tax liability, even though it has meant in part the introduction of extraneous matter. See U. S. v. Board (D. C.) 14 F.(2d) 459; Jones Syndicate v. Commissioner (C. C. A.) 23 F.(2d) 833; U. S. v. Klausner (C. C. A.) 25 F.(2d) 608.

Judgment may be entered as follows in favor of plaintiff, together with interest from the date of overpayment, and against defendants as follows:

Against defendant Charles V. Duffy for $28,010.38.

Against defendant Frank C. Ferguson for $12,728.58.

Against defendant Edward W. Gnichtel for $5,000.