## MINERAL MINING CO. v. UNITED STATES (two cases).

### Nos. 534, 535.

District Court, E. D. Wisconsin.

Sept. 10, 1942.

Douglass Van Dyke, of Milwaukee, Wis., for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe, and Lester L. Gibson, Sp. Assts. to the Atty. Gen., and Berthold J. Husting, U. S. Atty., and Elsmere J. Koelzer, Asst. U. S. Atty., both of Milwaukee, Wis., for defendant.

SCHWELLENBACH, District Judge.

These consolidated actions were brought by plaintiff to recover deficiency assessments levied against it for the calendar years 1936 to 1939 inclusive. Claims for refunds were duly filed and disallowed by the Commissioner. The facts were stipulated. The dispute involves claimed deductions for depletion of the plaintiff's mining property. The property is designated as the Osana Mine located near Iron River, Michigan. The plaintiff is lessee-lessor of seven-eighths and owner-lessor of one-eighth of the mine. Between 1910 and 1925 plaintiff itself operated the mine. Under its lease, it agreed to pay the owners of the seven-eighths interest a royalty of ten and one-half (10½) cents a ton for each ton mined and re-

moved from the premises with a minimum royalty or ground rent of $1575. In 1925, plaintiff, as the owner of one-eighth and lessee of seven-eighths of the mine, entered into a lease agreement with the James Mining Company (hereafter called James). James is owned by three consumers of iron ore—the American Radiator Company, the Steel Company of Canada, Ltd., and Perry Iron Company. The motive behind the formation of James was to enable its three stockholders to secure iron ore at less than the market rate and to insure continuity of operation of the mine. The contract provided that the operation and management of the mine on behalf of the plaintiff and James was to be performed by Pickands, Mather & Co. The buildings, machinery and equipment at the mine were sold by the plaintiff to James for $380,000, half of which was paid in cash. The additional $190,000 was paid at the rate of eleven (11) cents a ton on ore shipped. By 1936, these payments had all been completed. The exhibits include the preliminary agreement between the plaintiff and the three stockholders of James and Pickands, Mather & Co., and the contract for management between James and Pickands, Mather & Co., and the lease contract between the plaintiff and James. This is referred to throughout as the James Contract.

The James contract provided that James was to bear and pay the full costs of mining, producing, handling, and loading the ore. Payment for the ore was to be made as follows:

1. On the fifteenth day of January and July of each year, James was to pay plaintiff on all ore mined and shipped from the premises during the six months preceding the first day of January and July, respectively, the sum of ten and one-half (10½) cents per ton. (This was the amount plaintiff owed on its underlying lease).

2. On the twentieth day of January and July of each year, James was to pay plaintiff on all ore mined and shipped from the premises during the six months preceding the first day of January and July respectively, twenty-four and one-half (24½) cents per ton. (This is plaintiff's specified and certain royalty).

3. On January twentieth of each year, James was to pay to plaintiff an additional sum for each ton of ore shipped during the preceding calendar year equal to one-half (½) of the amount, if any, by which

the "Cleveland market price" during the preceding calendar year should exceed the cost of such ore so shipped; Provided that if one-half (½) of such excess did not amount to twenty-seven (27) cents per ton of ore shipped, James was to pay the plaintiff that sum as a guaranteed price. (The contract provided the mechanics for arriving at the so-called "Cleveland market price" and the cost of production. We are not interested in such mechanics here). (This third item is the undetermined and unspecified portion of the sum to be received per ton by the plaintiff from the James Mining Company. Plaintiff refers to it as the profit-sharing portion of its selling price. Defendant refers to it as the sliding scale portion.)

In order to protect the plaintiff against the possibility of non-operation or restricted operation, the contract contained a minimum annual royalty provision in the following paragraph: "the failure of the Vendee to produce and deliver as aforesaid, said minimum product in any year, shall not be deemed a breach of this agreement; but * * * said Vendee shall pay to the Vendor as advanced purchase price of ore thereafter to be shipped such an amount as may be necessary to make its * * * payments to the Vendor * * * for such year equal to the sum of fifty-one and one-half (51½) cents per ton on said minimum of 150,000 tons, ten and one-half (10½) cents per ton on the tonnage actually shipped during such year, and such part of the eighteen hundred dollars ($1800.00) minimum provided in its lease Exhibit I as the Vendor may be required to pay during such year, and all such payments so made shall be credited on the obligations of the Vendee to pay for or in respect of iron ore mined and shipped in any subsequent year or years in excess of said 150,000 tons minimum."

During the years from 1925 through 1930, the amount earned by the plaintiff exceeded the minimum payment of $77,250.00 required under the foregoing paragraph of the James contract. Accordingly, for each of these years no depletion question arose since the minimum payments did not consist of an advanced royalty but were royalties due and payable for the amount of ore shipped and sold. There is no dispute between plaintiff and defendant as to the rate of depletion established for plaintiff's interest in the ore. This rate of depletion —$0.2609 per ton—was established by the

Bureau of Internal Revenue and accepted by the plaintiff. However, during the years 1931 to 1934 inclusive the minimum payments were in excess of the royalties earned by the plaintiff. Consequently, under the paragraph of the James contract, James made payments for which it became entitled to credits to be applied on ore later mined and shipped in excess of 150,000 tons per year. During the years 1931 to 1934 inclusive, plaintiff took depletion deduction at the rate fixed by the Commissioner on the ore actually mined and shipped during those years. It took no depletion deduction for ore later to be mined and shipped for which it received advanced partial payments during those years.

During the years 1931 to 1934 inclusive, plaintiff had no net taxable income. So the failure on plaintiff's part to claim depletion deduction on partial advanced royalties raised no issue. It was not until 1936 and the succeeding three years that the issue arose. During these years, plaintiff claimed its deduction for depletion on that ore which it mined and shipped on which partial payment had been made by James during the depression years. The sole issue in this case is whether or not such claimed deductions for depletion should have been allowed. Defendant contends that they should have been taken during 1931 and 1934 inclusive and that by the failure to take them then, plaintiff waived its right to them. Plaintiff contends that it had the option to take them during either of the years.

The applicable statute reads as follows: Revenue Act of 1936, c. 690, 49 Stat. 1648, 1658, 26 U.S.C.A.Int.Rev.Code § 23.

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

* * * * *

"(m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised

and the allowance under this subsection for subsequent taxable years shall be based upon such revised estimate. * * *"

The corresponding provisions of the Revenue Act of 1938, c. 289, 52 Stat. 447, 462, are similar to those in the Revenue Act of 1936, set out above.

This statutory deduction is an act of legislative grace. Consequently, it and the regulations promulgated under it will be strictly construed. Plaintiff's right to a deduction must be bottomed on a clear and unambiguous provision of the statutes or the regulations. Deputy v. Du Pont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416; New Colonial Ice Co., Inc., v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348; Helvering v. Inter-Mountain Life Insurance Co., 294 U.S. 686, 55 S.Ct. 572, 79 L.Ed. 1227.

"Treasury Regulations 94, promulgated under the Revenue Act of 1936:

"Art. 23(m)-2. *Computation of depletion of mines, oil and gas wells, and other natural deposits without reference to discovery value or percentage depletion.*—The basis upon which depletion, other than discovery depletion or percentage depletion, is to be allowed in respect of any property is the basis provided in section 113 (a), adjusted as provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property. (See articles 113(a)-1 to 114-1.) If the amount of the basis as adjusted applicable to the mineral deposit has been determined for the taxable year, the depletion for that year shall be computed by dividing that amount by the number of units of mineral remaining as of the taxable year, and by multiplying the depletion unit, so determined, by the number of *units of mineral sold within the taxable year.* * * *

"As used in this article the phrase, 'number of units sold within the taxable year,' in the case of a taxpayer reporting income on the cash receipts and disbursements basis, includes units for which payments were received within the taxable year although produced or sold prior to the taxable year, and excludes units sold but not paid for in the taxable year. *The phrase does not include units with respect to which depletion deductions were allowed or allowable prior to the taxable year."* (Emphasis mine.)

It was under these statutes and these regulations that whatever rights plaintiff had to claim depletion deductions existed and that the depletion rate—$0.2609 per ton—was fixed by the Commissioner. The amount of plaintiff's allowable deductions during the years 1936 to 1939 inclusive must be determined by multiplying that figure by the number of units sold during each of the respective tax years. The disputed question is how many units of mineral were sold by the plaintiff during such years? The plaintiff contends that it sold those units of which it made delivery and on which it had previously received partial advanced payments. Defendant contends that these units were actually sold back in the depression years and that despite the fact that they were not delivered until later, the depletion deduction had to be taken then or not at all.

Defendant in its brief states that the accepted meaning in the iron mining industry of the term units sold is *"Tons sold are the number of tons for which payment is received or assured or can be compelled. The term does not consider any legal complications such as would be raised by plaintiff in the instant case in regard to legal ownership of the ore in place. A ton of ore is considered sold if a person receives for his equity in such ton an amount which makes such a ton a source of no further income."* Clearly, this definition flies squarely in the face of defendant's position here. In 1931 to 1934 plaintiff did not receive, nor did there accrue, nor could there be compelled payment for any number of tons. The number was not ascertained till 1936 to 1939 when the price per ton was determined. Even more forceful is the conclusion that during the early years plaintiff did not receive for its ore which it later delivered an amount which made each ton a source of no further income. The full payment was not made until the end of the years when deliveries were made.

Moreover, in the regulation, the Treasury did seek to define the term. It is that to which we must look. Helvering v. Hammel, 311 U.S. 504, 507, 61 S.Ct. 368, 85 L.Ed. 303, 131 A.L.R. 1481. Without doubt, it is not a true definition in any logistic sense. It seeks to express the reach of the term rather than to define it. Nonetheless it does specifically exclude "units with respect to which depletion deductions

were allowed or allowable prior to the taxable year." Since, by the regulation, plaintiff could not claim these deductions in 1936 to 1939 on units for which deductions were allowable during 1931 to 1934, our next task is to determine whether they would have been allowable if claimed during the earlier years. To find the correct answer to this problem, we must place ourselves back during the years 1931 to 1934 inclusive and determine whether or not plaintiff would have been entitled to deductions on the basis of the partial advanced payments. If such deductions were allowable during those years, plaintiff was compelled to take them. I cannot accept plaintiff's contention that it was optional. The only option open to a taxpayer under the mineral depletion statute is that afforded under the Revenue Act of 1932, § 114 (b) (4), 47 Stat. 203, 26 U.S.C.A. Int.Rev. Acts, page 520, to take percentage depletion. This is peculiarly one of those kind of cases where the question as to the allowability of a deduction during one year depends upon whether or not it could have been taken during a previous year. In viewing the case in this posture, it must be remembered that the plaintiff's right to take depletion deductions during the earlier years must be judged by the same criteria of strictness which confronts them when they seek to take them in the disputed years. As the Supreme Court said in Burnet v. Thompson Oil & Gas Company, 283 U.S. 301, 51 S.Ct. 418, 419, 75 L.Ed. 1049: "* * * the question for decision is purely one of statutory construction."

The answer to the question as to whether these depletion deductions were allowable during the previous years must be found in the regulation Article 23(m)-10:

"Art. 23(m)-10. *Depletion — Adjustments of accounts based on bonus or advanced royalty.—*

*     *     *     *     *

"(b) If the owner has leased a mineral property for a term of years with a requirement in the lease that the lessee shall extract and pay for, annually, a specified number of tons, or other agreed units of measurement, of such mineral, or shall pay, annually, a *specified sum of money* which shall be applied *in payment of the purchase price or royalty per unit* of such mineral whenever the same shall thereafter be extracted and removed from the leased premises, an amount equal to that part of the basis for depletion allocable to the number of units so paid for in advance of extraction will constitute an allowable deduction from the gross income of the year in which such payment or payments shall be made; but no deduction for depletion by the lessor shall be claimed or allowed in any subsequent year on account of the extraction or removal in such year of any mineral so paid for in advance and for which deduction has once been made." (Emphasis mine.)

On this point, our task is to place the paragraph of the James contract providing for advanced royalties alongside of the foregoing regulation in reference to advanced royalties and see whether or not plaintiff could successfully have claimed under it. There are two clear distinctions between the contract and the regulation: (1) Except as to a one-eighth (⅛) interest, plaintiff is a lessee rather than an owner. The regulation refers to owners. (2) The regulation permits the taking of a depletion deduction on advanced royalties where, under the lease, the lessee agrees to pay "a *specified* sum of money which shall be applied *in* payment of the purchase price or royalty per unit of such mineral whenever the same shall thereafter be extracted and removed from the leased premises." It is patent that the advanced royalty provision of the James contract does not require the lessee to pay annually a *specified* sum *in* payment of the purchase price or royalty per unit of such mineral. Under the James contract, the lessee agreed to pay an *unspecified sum* which would be applied *on* the payment of the purchase price.

No one can deny that there are these two distinctions between the contract and the regulation. The question is are they real distinctions which make a difference or are they distinctions so immaterial that had plaintiffs during the earlier years claimed deductions for depletion the Commissioner could not successfully have denied such claims on the basis of them?

■ As to the first of the distinctions, I am convinced it is a distinction without a difference. The economic interest which the plaintiff has in the lease through which it is entitled to depletion deductions has been recognized by the Supreme Court. It is not made dependent upon the particular legal form of the taxpayer's economic interest in the property to be depleted. Lynch v. Alworth-Stephens Company,

---

267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660; Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489. In fact, as defendant points out, plaintiff risks its entire claim to seven-eighths of its depletion deduction when it asserts that the use of the word "owner" makes any substantial difference in the interpretation of this regulation.

In my opinion, the second distinction is vital. The Secretary did use the words "a specified sum of money" and "*in* payment of the purchase price or royalty per unit." The Court cannot presume that the use of those words was inadvertent and coincidental. The explicit inclusion of this language cannot be ignored. The rationale of this regulation makes imperative the conclusion that the use of these words was purposeful and intentional. The Treasury recognized that injustices would exist where advanced royalties were paid if depletion deductions were limited to the years in which the ore was actually extracted and shipped from the property. By this regulation, the Treasury desired to correct and prevent such possible injustices, but it wanted to be sure that, if the taxpayer was to have the advantage of claimed depletion deductions during the years in which there was no actual physical depletion of the property, that there be definite and certain relationship between the amount of depletion deduction that could be claimed and the amount of ore against which such depletion deductions were charged. The Department did not intend to permit depletion deduction allowance in one year on the basis of advanced royalties and then later, with increased prices, have a very much smaller amount of actual physical depletion than the number of units for which depletion deduction credits had been allowed. The basic regulation by which depletion rates are figured contemplates allowances upon a per unit basis. Certainly the Secretary was not willing, when he promulgated the regulation, to permit it to be upon the basis of an indeterminate sum made as a partial payment upon later shipments. He required that it be upon the basis of a specified sum in full payment for later shipments.

Defendant, in its brief, says that it was reasonable for the Commissioner, for the purpose of depletion, to determine the number of tons paid for by advanced royalty "by dividing the minimum royalty rate into the amount of the advanced royalty received." Defendant concedes that "in so doing, the Commissioner recognizes that events in subsequent years might and most probably will establish that the determination was erroneous." It would be more than erroneous. It would be sheer fiction. Tax statutes deal with realities and not fiction. Moore v. Commissioner, 7 Cir., 124 F.2d 991. Under the James contract, when advanced royalties were paid, there was no present relationship between the amount paid and the tons to be shipped. To attempt to tie the per ton depletion rate to these partial advanced payments would beget only contradictions. To be reasonable, a result need not be precisely correct nor even exactly just. Helvering v. Safe Deposit & Trust Co., 316 U.S. 56, 62 S.Ct. 925, 86 L.Ed. ——, 139 A.L.R. 1513, decided April 13, 1942. It must, however, be reached by the use of a formula which bears some relationship to the factors involved in the problem. Otherwise, the reasoning is artificial and the result fictitious. Such a result is never reasonable.

Defendant's argument on this question is not strengthened by its rather indefinite reference to the practice of the Bureau in this regard. No established administrative practice is shown. "Administrative practice, to be accepted as guiding or controlling judicial decision, must at least be defined with sufficient certainty to define the scope of the decision." Estate of Sanford v. Commissioner, 308 U.S. 39, 50, 60 S.Ct. 51, 59, 84 L.Ed. 20. See, also, United States v. Stewart, 311 U.S. 60, 66, 61 S.Ct. 102, 85 L.Ed. 40.

Defendant asserts that acceptance of its position is made necessary in order to conform to the doctrine which requires determination of income at the close of the taxable year without regard to the effect of subsequent events. It cites Burnet v. Sanford & Brooks Company, 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383; Heiner v. Mellon, 304 U.S. 271, 58 S.Ct. 926, 82 L.Ed. 1337; Penn v. Robertson, 4 Cir., 115 F.2d 167. There is nothing in plaintiff's contention which runs counter to this rule. The end of each tax year presented a completed picture of all facts necessary to determine the taxable income for that year. This distinction was made in Guaranty Trust Co. v. Commissioner, 303 U.S. 493, 498, 58 S.Ct. 673, 676, 82 L.Ed. 975, where the Court said: "It is true that the acts of Congress taxing income have consistently laid the tax upon

510

the net income received by or accrued to the taxpayer in a 'taxable year,' which is either the calendar year or a different fiscal year, as the taxpayer may elect. But they have never undertaken to limit the income taxable in any one year to that derived from the taxpayer's activities occurring in that or any other single year. The items of gross income and of *allowed deductions* to be included in the income return, are those of the taxpayer for his taxable year, even though they may have resulted from or be affected by his business transactions of other years." (Emphasis mine.) See, also, Helvering v. Estate of Enright, 312 U.S. 636, 641, 61 S. Ct. 777, 85 L.Ed. 1093. This portion of defendant's argument would have been pertinent if plaintiff had, from 1931 to 1934, claimed depletion deductions on advanced royalties but had urged that the fixing of the amount of the deductions would have to await the later years when the number of units on which payments had been made could be ascertained.

Defendant places great emphasis on a quotation from Law of Federal Income Taxation by Paul and Mertens, § 21.16, entitled "Depletion Is Correlated To Income—Not Production." Because of the eminence of the authority, I have given particular weight to the quoted paragraph. I have studied it not only in connection with the notes appended to this particular paragraph but also in connection with the two chapters on depletion. I am convinced, after my analysis, that the statements contained in the section are not controlling here. The section was intended to answer the contention of many text writers and students of taxation, based upon language contained in Supreme Court opinions, that bonuses and advanced royalty payments could not have allocated to them any depletion deduction. I cannot accept the section and the cases cited in its notes and in the later cumulative supplements as meaning more than that. The fact is that there is a relationship betwen physical depletion and depletion deduction for tax purposes. As the Supreme Court said in Anderson v. Helvering, 310 U.S. 404, 408, 60 S.Ct. 952, 954, 84 L.Ed. 1277: "The deduction is, therefore permitted as an act of grace and is intended as compensation for the capital assets consumed in the production of income through the severance of the minerals." It is of interest to note that, in discussing the fundamental philosophy of depletion and deduction, Mr. Justice Murphy cited the three Supreme Court decisions which Messrs. Paul and Merten inferentially criticized for describing depletion as "the reduction of the mineral content" and "exhaustion of such property."

I am convinced that Article 23 (m)-10 of the Regulations is not applicable and that had plaintiff attempted to take depletion deductions on the basis of it during 1931 to 1934, the Commissioner could have and probably would have defeated the allowance of such deductions. That being true, plaintiff's right to the deductions is covered by Article 23(m)-2 of Treasury Regulation 94. The ore was sold during the years for which depletion deductions are claimed. The Commissioner erroneously rejected them. The fact that plaintiff had no taxable income in the earlier years and that this results in a reduction of revenue is immaterial. The James contract cannot be characterized as an anticipatory arrangement or device conceived with any desire to evade or even avoid payment of taxes. It was entered into and operated under eleven years prior to the time that this dispute arose. I am satisfied that the draftsmen of the James contract did not have in contemplation any situation such as eventuated in this controversy when the advanced royalty payment provision was written. Its purpose is clearly distinguishable from the purposes disclosed in the adoption of the anticipatory contrivances proscribed in Foster v. United States, 303 U.S. 118, 121, 58 S.Ct. 424, 82 L.Ed. 700; Tinkoff v. Commissioner, 7 Cir., 120 F.2d 564.

Judgments will be entered for the plaintiff in each case in accordance with this opinion.