## MOORE v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7706.

Circuit Court of Appeals, Seventh Circuit.

Nov. 26, 1941.

Thos. C. McConnell, James C. Leaton, and Conrad D. Philos, all of Chicago, Ill., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Bureau of Internal Revenue, and L. W. Post, both of Washington, D. C., and Gerald L. Wallace and Sherley Ewing, Sp. Assts. to Atty. Gen., for respondent.

Before EVANS, SPARKS, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

The Commissioner of Internal Revenue determined a deficiency in the income tax of 1936 against the Petitioner, Fay Harvey Moore. The Board of Tax Appeals, two members dissenting, upheld the assessment by the Commissioner, and this appeal was taken from the order of the Tax Board.

The Petitioner owned four thousand shares of stock in the Ajax Hand Brake Company. One George M. DeGuire desired to purchase this stock. An agreement was reached on December 31, 1935, and reduced to writing, whereby the Petitioner agreed to sell said stock to DeGuire for $96,000, of which $43,904 was to be paid in cash and $52,096 was to be evidenced by four notes executed by DeGuire dated December 31, 1935: one for $17,365, due on or before December 31, 1936; two for $8,682

each, due on or before December 31, 1937; and the fourth for $17,367, due on or before December 31, 1938, each of said notes to bear interest from date at the rate of five per cent per annum, payable semi-annually. In order to secure the payment of these notes, the Petitioner agreed to and did deliver the four thousand shares of stock, endorsed in blank, to one Bakke, the agent of DeGuire, for surrender to the Ajax Company, and received in exchange one certificate for 1,332 shares; two certificates for 667 shares each; and one for 1,334 shares. The Petitioner agreed to and did endorse these certificates in blank, and affix the necessary transfer tax stamps, and then attached the certificate for 1,332 shares to the first note, a certificate for 667 shares to each the second and third notes, and the certificate for 1,334 shares to the fourth note.

These notes and stock certificates attached were then deposited with the Harris Trust and Savings Bank of Chicago, to be held by it in escrow, to be delivered to DeGuire as and when he paid the notes and all interest due by the tender of a certified or cashier's check. If the notes were paid on or before due date, the notes and stock certificates attached thereto were to be delivered to DeGuire. If DeGuire failed to pay any note when due, the stock was to be delivered to the Petitioner and the note to DeGuire. The Petitioner was to have the right to vote the stock for the directors nominated by DeGuire, and to vote the stock with other restrictions.

The agreement contained this important provision: "All dividends which may be paid during the life of this agreement, on the stock of the Ajax Hand Brake Company agreed hereby to be sold, shall be credited by the recipient thereof upon the principal and interest of the next one of said notes thereafter to become due."

It was further agreed that DeGuire should not be personally liable on the notes or under the agreement to pay the balance of the purchase price of the stock, and the only remedy for his failure to pay the notes was for the Petitioner to take back the stock. DeGuire paid the cash payment stipulated in the contract of $43,904.

After this agreement was entered into, the Ajax Company declared and paid a dividend on the stock in question in the sum of $7 per share, or $28,000. The check for the dividend was made payable to the Petitioner, as she was the owner of record of the shares of stock. The check was then turned over to DeGuire, who had it certified and sent it by letter to the Harris Trust and Savings Bank in which he stated:

"Attached hereto find checks in payment of principal and interest."

The check was applied to the payment of the notes, then forwarded to the Petitioner by the Bank as payment received on the stock pursuant to the agreement, and then the Petitioner endorsed the check and deposited it to her account. This check paid the first and second notes, and released the stock certificate for 1,332 shares and one for 667 shares, which were attached to the respective notes. The certificates of stock were then turned in to the Ajax Company, and it issued new certificates to Helen A. DeGuire.

On June 27, 1936, DeGuire wrote a letter to the Harris Trust and Savings Bank, which contained his understanding of the nature of the transaction between the parties: "With reference to Escrow Agreement No. 6489 dated January 16, 1936, between the writer, Mrs. Moore, Mr. Bosworth and your bank, in connection with certain notes which you are holding for collection and against which stock of the Ajax Hand Brake Company is pledged as collateral."

The Respondent contends that this transaction was no sale, that it was an option to purchase granted to DeGuire; that Petitioner remained the owner of the stock at the time the dividend was declared, and was therefore owner of the dividend as such and properly taxed therefor as income.

The Petitioner contends there was a sale and the stock was held to secure the balance of the purchase price, and the title passed to DeGuire; that even if title had not passed, the beneficial interest of the stock was in DeGuire, and the Petitioner is not liable for the tax.

■ This transaction did have some of the aspects of an option in that DeGuire did not obligate himself to pay the balance due on the stock. It is argued that since DeGuire did not obligate himself to pay the balance of $52,096, he therefore had an option as to whether he would take the stock. When we consider the fact that DeGuire had paid down $43,904, we do not think he had very much option as to whether he should go ahead. The payment is too large to leave any option to DeGuire. Furthermore, the balance due drew interest, which is an unheard of thing in an option.

It is the usual thing for the unpaid balance of the purchase price in a contract of sale to draw interest, because that money is owing from the vendee to the vendor, but in an option, any sum to be paid above the option consideration does not draw interest because it is not owed and may never be, depending upon whether or not the option is exercised.

If the $28,000 dividend was a dividend to the Petitioner and belonged to her, we have the extraordinary situation of the Petitioner taking $28,000 that belonged to her and paying off an obligation that someone else owed her.

In the letter of June 27, 1936, by DeGuire to the Bank, DeGuire referred to this stock as pledged as collateral for payment of the notes he had executed. If this were the stock of the Petitioner, she would not be apt to put up her stock as collateral on an obligation due to herself.

In our opinion, the title to this stock passed to DeGuire upon the execution of the contract. Nothing remained for the Petitioner to do to divest herself of title. The stock was completely beyond her control, and she could get it again upon the happening of a condition subsequent. The transaction more nearly resembles a conditional sale, where title passes subject to be defeated by a subsequent failure to pay the balance of the purchase price for which the stock stands as security. Schneider v. Duffy, D.C., 43 F.2d 642–646.

Even if title to the stock remained in the Petitioner, it was only to secure her in payment of the balance of the purchase price. The beneficial use of the property was certainly in DeGuire.

In the present case, the Petitioner was bound by contract to credit any dividend paid during the life of the agreement upon "the principal and interest of the next one of the said notes thereafter to become due." This clause in the contract clearly implies that the parties intended to pass beneficial interest in the stock to DeGuire. From the correspondence in evidence which led to the formation of the contract, it appears that the clause governing the application of dividends was inserted in the contract at the instance of the seller. Unless the parties intended to pass beneficial interest in the stock to DeGuire, why would the seller insert such a clause? Certainly she was not limiting the disposition of dividends to which she believed herself entitled. If the dividends belonged rightly to the seller and were to be applied in the reduction of the purchase price as the Respondent contends, then surely the purchaser would have been the first to insist on the incorporation of this clause.

■ Tax statutes deal with realities and not fiction or fine-spun legalistic distinctions. In Griffiths v. Commissioner, 308 U. S. 355-357, 60 S.Ct. 277, 278, 84 L.Ed. 319, speaking for the Court, Mr. Justice Frankfurter said: "We cannot too often reiterate that 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed— the actual benefit for which the tax is paid.'"

Since the beneficial ownership of the property was not in the Petitioner and she did not receive the dividend as a dividend, she is not liable for the tax on such dividend. Bettendorf v. Commissioner, 8 Cir., 49 F.2d 173-175; Shellabarger v. Commissioner, 7 Cir., 38 F.2d 566; Central Life Assurance Society v. Commissioner, 8 Cir., 51 F.2d 939-941.

■ There is another question which arises on this appeal. The Petitioner had agreed to pay her attorney, employed in connection with the settlement of her husband's estate, as part of his compensation for such services five per cent of any sum which Petitioner might receive from all of her shares of stock in the Ajax Company, not to exceed in all $5,000. The Petitioner paid to the attorney five per cent of the $28,000 she received on the sale price of the stock she sold to DeGuire. This, she claims, was not taxable to her, as her agreement with her attorney for payment in this manner amounted to an equitable assignment of a part of the stock, and therefore she was a mere conduit for the payment to the attorney, and not taxable on this sum as income to herself.

The Commissioner and the Board of Tax Appeals held otherwise, and we think they were correct. The Petitioner did not agree to transfer or assign to the attorney and did not transfer or assign to him any interest or estate in the Ajax Company stock. She agreed to pay him five per cent out of any sum she received out of the stock. The attorney was not employed in any litigation involving the stock. It was just a yardstick to measure his fee within the limitation of $5,000. It was simply the designation of a fund or property from which a debt not related to that property was to be paid. There was no pledging of the property or

any part thereof or any interest therein to secure the payment of the agreed fee.

Under such circumstances, there was no equitable assignment. Lansill v. Burnet, 61 App.D.C. 107, 58 F.2d 512.

The decision of the Board of Tax Appeals with reference to the Petitioner's liability for tax on the dividend is reversed.

The decision of the Board of Tax Appeals on the Petitioner's liability for tax on the five per cent of the dividend which she paid to her attorney is affirmed.

EVANS, Circuit Judge (dissenting).

Whether the dividend declared by Ajax Hand Brake Company, and paid by check to the petitioner, on the 4,000 shares of stock, the title to which is the controverted question in this case, should be included in petitioner's taxable income, turns upon the effect of the written contract which she made with George M. DeGuire. If she, by that contract, sold the said four thousand shares of stock to DeGuire, then the dividend, as such, was not properly included in her income. In such case, it was received by her as a part payment of the purchase price.

Whether a contract is a sale or an option is ordinarily a legal question, although it might become a factual dispute in the absence of express agreement coverage. In case the issue involves a factual question, the Board's finding in respondent's favor would be binding on us.[1]

I believe the question in this case is a legal one, and we are not precluded from deciding it, by the findings and conclusions of the Board of Tax Appeals. Where the agreement is silent, on the second party's agreement to pay the purchase price, a court or board may nevertheless find an obligation to pay, from the surrounding facts and circumstances. In such a case, the agreement would be a sale.

If, however, there is an express provision in the written agreement, as here, whereby it is agreed that second party shall not be liable for the payment of any further sums on the purchase price, then there is no basis for a contrary fact finding. The contract is then an option.

The provisions of the agreement which lead me to the conclusion that this was an option and not a sale, are:

(a) "* * * in the event of the failure of the party of the third part to pay the principal and accrued interest of any of the said notes as and when such principal shall become due and payable, such note shall be delivered to the party of the third part and the certificate or certificates of stock attached thereto shall be delivered to the party of the first part or the party of the second part as the case may be."

(b) "It is understood and agreed that the party of the third part (the alleged purchaser) shall not be liable under this agreement or otherwise upon any of the said notes and that the only remedy of the parties of the first and second part in the event of the failure of the party of the third part to pay any of said notes and accrued interest thereon shall be the right to the redelivery of the certificates of stock attached hereto."

(c) "The parties of the first and second part shall have the right at all times to vote the stock *owned by them* and standing in their names on the books of the company notwithstanding the certificates therefor shall have been indorsed in blank and attached to said notes."

(d) "The party of the second part *agrees* to sell[2] to the party of the third part" four thousand shares, etc.

Whether an agreement is a sale or an option depends upon the existence or absence of an obligation of the second party to pay the price agreed upon. In the absence of such an obligation there is no sale. Obviously the amount of the down payment has no bearing on the determination of a sale or an option. An optionee would pay more for an option on a land supposedly underlaid with oil when the drill is near the oil well and signs are favorable, than for a farm which has no price fluctuating influences. Moreover, the evidence shows that a dividend was near at hand, and was actually declared and paid within a few months of the execution of the option, which was about one-half the down payment referred to in the majority opinion. The character of the contract depends on something more certain that the down payment. It is the obligation to *pay* the purchase price, and that only, which makes it a sale.

[1] Elmhurst Cemetery Co. v. Commissioner, 300 U.S. 37, 57 S.Ct. 324, 81 L. Ed. 491.

[2] The agreement does not sell. The owner *agrees* to sell.

In Western Union Tel. Co. v. Brown, 253 U.S. 101, 40 S.Ct. 460, 462, 64 L.Ed. 803, we have a case which is helpful in that it emphasizes the need of the existence of an obligation to pay the purchase price to make a contract a sale.

The court said,

"What, then, is the nature of this agreement? It contains the positive undertaking of the owner to sell *and the purchaser to buy* 625,000 shares of stock upon terms which are named. Upon the first payment being made, the certificates are to be deposited with the bank in escrow, to be delivered when the final payment agreed upon is made, and in event of default in payment the bank is authorized to deliver the shares of stock to Pitt and Campbell, and all payments are to be forfeited, and the rights of the parties to cease and determine. We are of opinion that this is far more than a mere option to purchase, terminable at the will of the purchaser upon failure to make the payments required. *The agreement contains positive provisions binding the owner to sell and the purchaser to buy upon the terms of the instrument.* * * * There was no understanding that Pitt and Campbell should take back the stock when the payments were not made, and no agreement which put it in the power of the purchasers to relieve themselves of the obligations of their contract by failing to keep up the payments. * * *

"The written agreement contains a positive undertaking *to sell, upon the one part,* and, upon *the other part, to buy* shares of the mining stock."

In the contract before us, the express provision, twice set forth, affirmatively stated the second party did not agree and was not required to pay the purchase price. At his option, the previous payments could be forfeited and an obligation to make the balance of the payments was expressly denied. This, in my opinion, determined the legal status of the parties under the contract. Until second party obligated himself to pay the purchase price it was an option contract.

As there was no sale of the stock until after the dividend was declared, the dividends belonged to petitioner who was the owner. They were, under the Federal income tax law, properly included in the income of the petitioner.