COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Robert J. and Emma R. STUART, Respondents.

No. 13615.

United States Court of Appeals Third Circuit.

Argued Dec. 5, 1961.

Decided April 4, 1962.

---

Joseph Kovner, Washington, D. C. (Louis F. Oberdorfer, Assistant Attorney General, Lee A. Jackson, I. Henry Kutz, Attorneys, Department of Justice, Washington, D. C., on the brief), for petitioner.

Harry Yohlin, Philadelphia, Pa. (Polisher, Steinberg & Yohlin, Bennett L. Aaron, Philadelphia, Pa., on the brief), for respondents.

Before GOODRICH, STALEY and GANEY, Circuit Judges.

GANEY, Circuit Judge.

This is a review of a decision of the Tax Court at the request of the Commissioner of Internal Revenue. The question presented is whether or not that Court correctly held that the sale or other disposition of taxpayers' real property was made in 1954 within the meaning of § 453(b) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 453(b), as the taxpayers maintained, rather than in 1955, as the Commissioner contended.

The basic facts are not in dispute and, as obtained from the opinion of the Tax Court,[1] may be stated as follows: In 1954, the taxpayers, husband and wife, owned and resided upon a 187.74 acre farm near Beverly, New Jersey. On April 21, 1954, they entered into a written agreement to sell the land to the purchasing agent ("Buyer") of Levitt & Sons, Inc., which was then engaged in the development of Levittown, New Jersey. In pertinent part the agreement provides:

> "WITNESSETH, That the Seller and Buyer respectively agree to sell and buy ALL THAT CERTAIN tract and parcel of land * * * consist-

---

1. The decision of the Tax Court is reported at 19 T.C.M. 1311 (1960) under the caption Robert J. and Emma R. Stuart v. Commissioner of Internal Revenue.

ting of approximately 187.74 acres * * * "for the price of * * * $150,000.00 * * * under the following conditions:

"1. (a) A payment of * * * $1,500.00 * * * made herewith is to be applied on account of the purchase price.

"(b) A further payment of * * * $1,500.00 * * * shall be made on or before July 20, 1954, to be applied on account of the purchase price.

"(c) A further payment of * * $12,000.00 * * * shall be made on or before October 20, 1954, to be applied on account of the purchase price.

"2. Settlement is to take place at Burlington County Abstract Company, 451 High Street, Burlington, New Jersey, on the 20th day of April, 1955, at 2 o'clock P. M., which time is of the essence of this agreement, when the Seller shall deliver a general warranty deed for the said premises, at which time the balance of the purchase price is to be paid. Buyer shall have the right to advance the settlement date by no more than six months, by giving thirty days notice in writing to the Seller of his intention to do so.

"The above consideration is to be delivered to Burlington County Abstract Company to be disbursed after the insurance company selected by Buyer has completed the necessary continuation search to cover the record date of said deed.

"3. In the event that the Buyer shall fail to make any of the payments called for hereunder, or shall fail to make settlement in accordance with the terms hereof, then and in that case all sums paid on account by the Buyer shall be forfeited to the Seller as liquidated damages, and Buyer shall be released from all obligation and liability, including any right of the Seller to bring an action for specific performance, and all rights and liabilities of both parties to this agreement shall cease and determine.

"4. The title to be delivered shall be marketable title and insurable by the title insurance company selected by the Buyer * * *

* * * * * *

"6. Actual possession is to be given to the Buyer on October 20, 1955.

* * * * * *

"9. This agreement includes all fixtures permanently attached to the building or buildings * * * and appurtenances; also specifically includes the following items:

"9A. Seller shall have the right to completely harvest all crops planted for the year 1954, & 1955, up to October 20, 1955.

"9B. Seller shall have the right to remove all buildings and trees from the premises in question.

"9C. Seller shall have the right to occupy and use the dwelling and all buildings up to October 20, 1955.

"10. Buyer shall have the right at any time or times prior to settlement to enter upon the premises for the purpose of making test borings or test excavations, or any other work of a similar nature, provided, however, that in such event Buyer shall reimburse Seller for any damages that may be thereby inflicted upon the crops or other installations of the Seller. * * * "

The agreement was modified in order to change the provision for payment in full of the $135,000 balance of the purchase price at settlement to payment of $85,000 in cash, plus a purchase money mortgage in the amount of $50,000, payable in installments of $20,000 on April 1, 1956, and $30,000 on April 1, 1957. Although the taxpayers began searching for another abode during May of 1954, they continued to live in the dwelling located upon the land until May of 1956. Levitt & Sons, Inc., made use of the land in accordance with paragraph 10 of the

agreement. It does not appear when settlement took place. On this point, the Tax Court said: "Settlement was made and title to the land transferred more than a year prior to May of 1956." On account of the purchase price the taxpayers received $15,000 in 1954, $85,000 in 1955, $20,000 in 1956, and $30,000 in 1957. For the taxable years ending in 1954 and 1955, taxpayers reported the gain from the sale or other disposition of their real property pursuant to § 453 (b) of the Code. The Commissioner determined that they were not entitled to use the installment method of reporting the gain from the disposition of their property, recomputed their returns in accordance with the long term provisions of the Code, and assessed a deficiency for the year 1955. Taxpayers petitioned the Tax Court for a redetermination of the deficiency.

■ Before one who sells real property on an installment plan [2] extending over a taxable year may take advantage of § 453(b) of the Code,[3] not more than thirty per cent of the selling price may be received in the year of the sale or other disposition of the property. There is no question that the taxpayers received less than thirty per cent of the selling price in 1954 and more than thirty per cent in 1955. There is a dispute as to whether the sale or other disposition of the property took place in 1954 or 1955.

■ The Tax Court stated: "In the case before us there was already a binding agreement on April 21, 1954, between the respective parties to buy and sell real property. So binding was the agreement that it was necessary that the buyer be relieved by paragraph 3 of the agreement of the obligation to specifically perform thereunder in consideration of the payment of $15,000 liquidated damages. By the agreement taxpayers immediately disposed of all the incidents of ownership in their land and the right of the purchaser to exercise the incidents of ownership thereafter was absolute with the exception that petitioners were permitted to occupy the dwelling therein for a fixed period and that legal title was not to pass until the settlement date. See Wiseman v. Scruggs, 281 F.2d 900 (C.A.10, 1960)." (19 T.C.M. 1311, 1314). The real property is situated and the agreement was made in New Jersey. We look to the law of that State to determine what disposition was made of the property in 1954 and 1955.[4] See Lucas v. North Texas Co., 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668 (1930); National Memorial Park, Inc. v. Commissioner, 145 F.2d 1008, 1014 (4 Cir. 1944), cert. denied 324 U.S. 858, 65 S.Ct. 861, 89 L.Ed. 1416.

■ We agree with the Tax Court that an enforceable agreement came into existence upon the signing of the document on April 21, 1954. However, it did not bind the Buyer to perform his promises. Except for the forfeiture of installments already paid, paragraph 3 of

2. Any plan involving an arrangement for the sale of land or chattel with payment of the purchase price to be made in two or more periodic payments. See Consolidated Dry Goods Co. v. United States, 180 F.Supp. 878 (D.C.Mass.1960).

3. With reference to this section, the Court, in Wiseman v. Scruggs, 281 F.2d 900 (C.A.10, 1960), at p. 902, said: "It concerns itself with the return of income on the installment method. And in presently pertinent part, it provides in substance that where real property is sold on an installment basis extending over more than one year with not more than thirty per cent of the selling price received in the year of the sale, the taxpayer may at his election treat the sale

on an installment basis and return as income therefrom in any taxable year only the proportion of the gain reflected by the payment received in that year."

4. In Tunkel v. Filippone, 4 N.J.Super. 107, 66 A.2d 339, 341 (Super.A.D.1949), the Court said: "We must start with the assumption that all the words, printed or written, above the signatures are part of the contract, and that the parties intended each covenant to be effective. A construction is favored that gives to the covenant a reasonable meaning and the certainty which is essential to an enforceable contract. Rest.Contr., § 236; Bullowa v. Thermoid Co., 114 N.J.L. 205, 176 A. 596."

the agreement permitted him to terminate the agreement with impunity at any time prior to settlement.[5] Under New Jersey law, that paragraph transformed the agreement into one of option. Such an agreement, as distinguished from an agreement of sale, imposes no binding obligation on the holder of the option. Sooy v. Henkelman, 104 N.J.L. 540, 142 A. 17 (1928); Wellmore Builders, Inc. v. Wannier, 49 N.J.Super. 456, 140 A.2d 422 (1958).

In the case before us the Buyer kept the option alive by paying the installments amounting to $15,000 as they became due. He could have refused to make any more down payments after making the first $1,500 and would have been relieved of any obligation to pay more. The option to buy was not exercised until the Buyer tendered a purchase money mortgage in the face amount of $50,000, payable as agreed, plus $85,000 in cash on April 26, 1955, at which time he received a deed to the land. Until that time he had only an inchoate right; he was not entitled to the deed before then. Bright v. Forrest Hill Park Development Co., 133 N.J.Eq. 170, 31 A.2d 190, 198 (Ch. 1943). Thus the agreement did not create an unconditional obligation to sell and an unconditional obligation to buy, which were absolute and enforceable at the time of the signing. There never was an unconditional liability on the part of the Buyer for the balance of the purchase price until settlement was completed. At that time a sale of the real property took place, over a year after the signing of the agreement.

The inchoate right to acquire the land by the Buyer prior to the sale of the real property was not a "disposition" of property within the meaning of § 453(b) of the Code. Hence the ultimate finding by the Tax Court that the taxpayers made a sale or other disposition of their land on April 21, 1954, within the meaning of that section, was clearly erroneous.

The decision of the Tax Court will be reversed.

STALEY, Circuit Judge (dissenting).

One of the reasons for adopting the installment plan of reporting income was to relieve taxpayers from having to pay an income tax in the year of sale based on the full amount of anticipated profits when in the tax year they received in cash only a small part of the sales price. Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948). Section 453 being remedial, "manifestly it is to be construed liberally in favor of the taxpayers to give the relief it was intended to provide." Bonwit Teller & Co. v. United States, 283 U.S. 258, 263, 51 S.Ct. 395, 75 L.Ed. 1018 (1931); Kelly-Springfield Tire Co. v. United States, 81 F.2d 533 (C.A.3, 1935). The majority here is doing just the contrary.

Whether the instrument here in question should be construed as an option or contract of sale depends not on any particular words but on the manifested intent of the parties. "In determining whether a conveyance is, or is not, effective, and if effective, just what its effect is, the intent of the conveyor is always an important, and often the decisive factor." Restatement, Property, § 11, comment d, (1936). Intent is, of course, a question of fact, and the Tax Court's finding in this regard must be affirmed unless clearly erroneous. In the agreement here, the buyer expressly agreed to buy and the taxpayers to sell. The taxpayers disposed of all incidents of ownership in the land, and the right of the purchaser to exercise the incidents of ownership was absolute with certain exceptions which in themselves clearly show that the parties intended to enter into a binding agreement. During the year 1954, the buyer paid taxpayers $15,000 as he was required to do by the agreement. The remainder was to be paid at the time of settlement. The taxpayers specifically reserved the right to harvest the crops during all of 1954 and part of 1955, and to remove all build-

5. See Lawler v. Commissioner, 78 F.2d 567 (C.C.A.9, 1935).

ings and trees and to retain occupancy and use of the structures until 1955. Shortly after the agreement was signed, the taxpayers began looking for a new farm in New York and Maryland, and as early as February 1955 bought one in New Jersey. As one of the taxpayers testified, "The farm was sold and we hunted for a farm right away." In 1954, the buyer sent numerous employees and heavy equipment on the land in order to prepare for construction. In accordance with the agreement the deed to the property was delivered in 1955. These facts clearly show that the parties intended a sale.

It is accepted that where an agreement is made in which there are mutual promises to buy and sell, such an agreement is not turned into an option by the fact that there is also a provision for forfeiture of down payment as liquidated damages in case of a failure by the purchaser to perform. 1 Corbin on Contracts § 274, pp. 921–922 (1950). The fact that the extent of purchaser's liability in case of breach was to be determined by the liquidated damages clause is of itself unimportant, for the Commissioner's own regulation under the section here involved, Treas.Reg. 1.453–5 (1958), establishes a procedure for reporting income in the event the purchaser fails to perform.

I do not think that Sooy v. Henkelman, 104 N.J.L. 540, 142 A. 17 (1928), and Wellmore Builders, Inc. v. Wannier, 49 N.J.Super. 456, 140 A.2d 422 (1958), which the majority cites, require a different conclusion. In Wellmore Builders, the question before the court was not whether the agreement was one of sale, for neither party so contended. The court there had to determine whether the writing constituted an option or a right of preemption. In Sooy, the court indicated that under the circumstances, the par-

ties had agreed to an option, and at 142 A. 18, went on to say: "Now, the rule is that whether an instrument in writing transferring an interest in real estate shall be construed as an absolute contract for sale and purchase or only an option to purchase depends not on any particular words or phrases, but on *the intention of the parties to be derived from the instrument itself by a consideration of its parts, and, when that is doubtful, from the circumstances attending it.*" (Emphasis supplied.)

It was the Commissioner who, by regulation, first expressly authorized the use of installment reporting. In holding those regulations ultra vires, the Board of Tax Appeals in B. B. Todd, Inc., 1 B.T.A. 762 (1925), indicated that the regulations had been promulgated in order to reduce the over-all tax paid. Immediately thereafter, Congress, in the Revenue Act of 1926, § 212, authorized installment reporting. That provision was reenacted as § 44 of the Revenue Act of 1928 and the Internal Revenue Code of 1939, and § 453 of the Internal Code of 1954.[1] See Commissioner of Internal Revenue v. South Texas Lumber Co., supra.

Here, one of the taxpayers testified that they intended to take advantage of the relief contained in § 453 and in fact adjusted the selling price in accordance with the tax savings that would result from payments on the installment plan. It appears that the taxpayers originally asked for a larger selling price, which was reduced because of a suggestion by the buyer's counsel that since payments would be made on an installment basis, there would be a tax savings. The sale was consummated as agreed to. Under these circumstances, to hold as the majority does would negate the intent of Congress.

---

1. The only substantive change worked by § 453 was that the taxpayer need not receive any payment in the year the sale is agreed to, but can receive up to thirty per cent. 3 U.S.Code Cong. & Adm.News Serv., 83d Cong., 1st Sess., 1954, pp. 4299, 4943. See Gilbert v. Commissioner, 241 F.2d 491 (C.A.9, 1957).