Samuel W. FLETCHER and Charlotte D. Fletcher, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 1942.

United States District Court
N. D. Indiana,
Fort Wayne Division.

Dec. 14, 1967.

John D. Shoaff, Shoaff, Keegan & Baird, Fort Wayne, Ind., for plaintiffs.

Alfred W. Moellering, U. S. Atty., Fort Wayne, Ind., for the Government.

## MEMORANDUM OF DECISION

ESCHBACH, District Judge.

This civil action to recover federal income taxes, allegedly erroneously and illegally assessed and collected, was instituted by the filing of a complaint on December 14, 1967 by Samuel W. Fletcher and Charlotte D. Fletcher, husband and wife ["taxpayer"], against the United States of America.[1] Trial to the Court was held in Fort Wayne, Indiana, on April 21, 1969. This court has jurisdiction pursuant to 28 U.S.C. § 1346 (a) (1) (1964).

This suit concerns the proper treatment for tax purposes of gain from the sale by the taxpayer of 6,000 shares of stock of Peoples Life Insurance Company. Taxpayer sold this stock on November 13, 1957 and received part of the consideration in the taxable year 1957 and the balance in the taxable year 1958. On tax returns timely filed for the years 1957 and 1958, taxpayer reported this gain as long term capital gain. The Commissioner, however, determined that the gain was short term capital gain and in 1963 assessed a deficiency for 1957 and 1958, plus interest. Taxpayer paid the deficiency and, on May 21, 1965, filed a claim for refund, which was disallowed. This suit followed.

A principal issue is the determination of the date on which taxpayer's holding period for the stock began. The taxpayer contends that the holding period began on May 9, 1957, more than six months before the date on which taxpayer sold the stock. It was on May 9, 1957 that taxpayer executed the contract pursuant to which he bought the stock. Taxpayer's position is that title passed and he acquired substantial equitable rights in the stock on May 9. The Government, on the other hand, contends that the holding period did not begin until August 9, 1957, less than six months before taxpayer sold the stock. August 9 is the date on which taxpayer made his final payment for the stock. The Government argues, alternatively, that the document of May 9 was merely an option contract or an alternative contract to buy the stock which was not exercised until August 9 or that the May 9 document, if it was a sales contract, did not put title in the taxpayer until August 9. In addition, the Government argues that taxpayer was acting as the agent for an undisclosed principal so the gain from the sale of the stock was compensation for services which would be taxable at ordinary income tax rates. This court holds that taxpayer's holding period began on May 9, 1957 and that he was not acting as an agent. The gain from the sale of the stock, therefore, is long term capital gain, and judgment will

---

1. Charlotte D. Fletcher is a party solely because she signed joint returns for 1957 and 1958 along with her husband. The transactions in question involved only Mr. Fletcher.

be for the taxpayer. Int.Rev.Code of 1954, §§ 1222, 1221, 1201(b).

The agreement of May 9, 1957 was executed by Lyman E. Boyle, seller, and the taxpayer as buyer. A copy of the actual contract is attached hereto as an Appendix. In pertinent part, it provided that seller "agrees to sell and does hereby sell" to buyer 6,000 shares of stock "upon the following terms and conditions." Buyer agreed to pay $960,000.00 for the stock—$1,000.00 on May 9, $4,000.00 within 10 days, and the balance of $955,000.00 on or before December 9, 1957. A dividend which was expected to be paid on July 1, 1957 was to belong to seller if buyer had not by then paid the full price; otherwise it would belong to buyer. Seller was to endorse the stock in blank and deposit it with an escrow agent who was to hold the stock until the full purchase price was paid. Buyer was to pay the escrow fees, all taxes associated with the transaction, and seller's attorney's fee of $15,000.00. Paragraph 7 of the agreement, an inartful conglomeration of language which the Government attempts to characterize as a "no recourse" clause, provides that "in the event that [buyer] is unable to pay the balance of the purchase price on or before August 9, 1957 or for any other reason defaults and so informs [seller] by registered letter * * this contract will then be considered null and void." In the event of buyer's death before August 9, 1957, and if "his personal representative cannot carry out the terms of this contract," then the personal representative was to notify seller by registered letter "that said contract will not be fulfilled by reason of the death of [buyer], and in any event the amounts heretofore paid to [seller] as part of the purchase price herein shall be retained by him as liquidated damages." Paragraph 7 continues:

"In the event the [buyer] does not complete the purchase of said stock on or before December 9, 1957, consistent with the terms of the within agreement, then and in that event the [buyer] will pay to the [seller] the additional sum of Twenty Thousand Dollars ($20,000.00), which sum is agreed upon between the parties, as liquidated damages and this contract will then become null and void and of no force and effect."

The last paragraph of the agreement provides that the agreement shall be binding upon the heirs, representatives, and assigns of the parties.

Both parties fully complied with the terms of the contract. Buyer paid the $1,000 on May 9 and paid the additional $4,000.00 within 10 days. The stock was endorsed by the seller and placed in escrow pursuant to an escrow agreement dated June 26, 1957. The balance of the purchase price was paid on August 9, 1957, and buyer took possession of the stock certificates.

The Government argues that the agreement of May 9, 1957 was an alternative contract in which seller agreed to sell and buyer agreed either to buy *or* to forfeit his down payment and pay liquidated damages. In support of this interpretation of the contract, the Government argues that Paragraph 7 of the agreement permitted the taxpayer, if he chose, to "bow out" of the contract before August 9, 1957 for "any reason merely by so notifying [seller] by registered letter and forfeiting the $5,000 down payment." In other words, the Government argues that Paragraph 7 denies seller his usual remedies for the purchase price or for damages in the event of a default by the buyer.

To consider properly the contentions of the Government requires a review of the contract itself, a survey of the case law which has construed many of the terms the parties used here, and an examination of any other indications going to the intent of the parties. The question is whether this contract is a truly alternative contract or whether buyer promised a single performance but provided for liquidated damages in case of a breach. This is a problem of interpretation in light of the surrounding facts. 5 A. CORBIN, CONTRACTS §

1070 (1951). As will be seen, the Government's arguments are without merit.

The Government's argument begins by completely ignoring Paragraph 1 of the agreement in which buyer unequivocally "agrees to pay to the said [seller] for said stock the sum of Nine Hundred Sixty Thousand Dollars. * * * " The question, therefore, is whether or not Paragraph 7 gives to the buyer an alternative from which he would appear to be foreclosed by Paragraph 1.

The second paragraph of Paragraph 7 gives seller the right to a payment from the buyer of $20,000.00 "as liquidated damages" in the event that buyer does not complete the purchase of the stock on or before December 9, 1957. If buyer does not complete the purchase by December 9 and if buyer pays $20,000.00 to seller the "contract will then become null and void and of no force and effect." The first sentence of the first paragraph of Paragraph 7 substantially overlaps the second paragraph and provides that in the event that buyer "is unable to pay the balance of the purchase price on or before August 9, 1957, or for any other reason defaults * * * this contract will then be considered null and void." If buyer fails to pay the purchase price before August 9, a fortiori he fails to pay it before December 9, and, again, seller would have a right to a payment of $20,000.00 as liquidated damages. In either of these cases, it is not certain that the $5,000.00 already paid to seller would be a credit against the $20,000.00 or that it would be retained by seller in addition to the $20,000.00 so that seller would retain a total of $25,000.00. It is equally uncertain whether or not the second sentence of the first paragraph of Paragraph 7 resolves the dilemma. This resolution, however, is not necessary to a decision of the issues of this case because it is clear that the parties, by Paragraph 7, have attempted to fix the measure of damages, in the event of a failure by the buyer to pay the purchase price, at a sum of at least $20,000.00.

■ The Government's argument focuses on the first sentence of the first paragraph of Paragraph 7 and asserts that this language eliminates the buyer's obligation to pay the purchase price. The language, however, does not so operate. The words "null and void" in these circumstances do not mean that seller's sole remedy in case of a default by the buyer is to take back the stock and recover $20,000.00 from the buyer as liquidated damages. Phrased differently, the words do not mean that the buyer can force the seller to take back the stock by tendering to him a payment of $20,000.00. "Null and void" as here used means that the contract is voidable *at the election of the seller.* Stewart v. Griffith, 217 U.S. 323, 30 S.Ct. 528, 54 L.Ed. 782 (1910); Burns Mortgage Co. v. Schwartz, 72 F.2d 991 (3d Cir. 1934); see Western Union Telegraph Co. v. Brown, 253 U.S. 101, 40 S.Ct. 460, 64 L. Ed. 803 (1920); 1A A. CORBIN, CONTRACTS § 166 (1950).

■ Furthermore, there is nothing about the per se presence of a liquidated damages clause which restricts the seller's remedies in case of a breach by the buyer. That is, the bare fact that the parties have attempted to liquidate the amount of damages in the event of a breach does not necessarily mean that the seller's remedies are restricted to the recovery of damages. At least two decisions have considered the effect of a liquidated damages clause upon a seller's right to maintain an action for the contract price, and both have held that the clause presented no obstacle. In Biscayne Shores to Use of New Biscayne Shores Co. v. Cook, 67 F.2d 144 (3d Cir. 1933), the contract provided, in case the buyer failed to make his payments, that the buyer's deposits should "be retained by [seller] in full satisfaction and liquidation of all damages by [seller] sustained." The court held even that strong language did not affect the "overwhelming weight of authority" that a seller has the option to retain the payments or sue for the purchase price. *Id.* at 145. In Kilsheimer v. Rose & Moskowitz, 257 F. 2d 242 (2d Cir. 1958), the seller, a court-appointed receiver, sold land at a public

sale to the buyer who made a deposit. The contract provided "in case of default of any payment, the deposit shall be retained as liquidated damages." The court affirmed the granting of specific performance for the seller and rejected the buyer's argument that the contract limited seller's rights to the retention of the deposit.

Comparing *Biscayne Shores* with *Kilsheimer* shows that there is little practical difference between a seller's action for the purchase price and for specific performance. The principal difference in the instant context is historical only. The Restatement, for example, lists three judicial remedies for breach of a contract: damages, restitution, and specific performance. Restatement of Contracts § 326 (1932). The comment, however, indicates that these remedies tend to overlap:

> [a] judgment for the collection of a contract debt is included among judgments for damages; but such a judgment comes as near to being a judgment for the specific performance of a promise as do many of the decrees that are so described.

*Id.,* Explanatory Notes § 326, comment *a* at 499 (1932). It is clear, therefore, that authorities considering the effect of a liquidated damages clause upon an action for specific performance are closely analogous to the present question.

The Restatement itself provides that "[t]he fact that a contract contains a provision for the payment of * * * liquidated damages for breach of a promise is not a bar to the specific enforcement of the promise." Restatement of Contracts § 378 (1932). Rigs v. Sokol, 318 Mass. 337, 61 N.E.2d 538 (1945), concerned a contract to lease a store and sell a business, including good will, fixtures, and personal property, which provided that if either party refused to perform, the refusing party should pay the other the sum of five hundred dollars. The buyer-lessee was granted specific performance. The court held that the right to specific performance is not lost because the contract contains a provision for the payment of liquidated damages in the event of a breach. Ordinarily, parties to a contract contemplate that the contract will be performed—payment of liquidated damages is not the "price" for the privilege of non-performance. In Randall v. Douglass, 321 Mich. 492, 32 N.W.2d 721 (1948), the seller was permitted to maintain an action for specific performance. Seller had accepted an offer which provided that buyer agreed to buy or forfeit to the seller "the deposit made herein as liquidated damages." And in Armstrong v. Stiffler, 189 Md. 630, 56 A.2d 808 (Ct.App.1948), a buyer was granted specific performance of a contract to sell shares of stock in spite of a clause which stated "[i]n case of default [buyer] promise[s] to pay $300 per share * * * as liquidated damages." *See also* Roth v. Hartl, 365 Pa. 428, 75 A.2d 583 (1950); Franko v. Olszewski, 316 Mich. 485, 25 N.W.2d 593 (1947); *cf.* Beery v. Plastridge Agency, Inc., 142 So.2d 332 (Fla.App.1962); Simenstead v. Hagen, 22 Wis.2d 653, 126 N.W.2d 529 (1964); Bauer v. Sawyer, 8 Ill.2d 351, 134 N.E.2d 329 (1956).

Many of these decisions, however, indicate that there is an exception to the rule that a liquidated damages clause does not bar an action for specific performance or an action for the contract price. If the parties intended that the remedy of liquidated damages should be the exclusive remedy, a court will give effect to that intention. An examination of the indications of the parties' intent, therefore, is necessary.

Nothing on the face of the contract indicates that the parties intended that taxpayer could *lawfully* avoid his promise to pay the purchase price for the stock by tendering twenty thousand dollars and giving up his right to receive the stock. The parties clearly recognized that nonpayment would be a *breach* of the contract. The critical language is that, if buyer is unable to pay the balance of the purchase price by August 9 "or for any other reason *defaults*," then the contract will be considered "null and void." (emphasis added) This must be

taken to mean that the contract is "null and void" (at seller's election; see *supra)* upon a *default, i. e., a breach,* by the buyer whether the reason is an inability to pay or whether it is any other cause. In addition, the twenty thousand dollars that the buyer might pay to the seller is called "liquidated *damages."* (emphasis added). If one has a *right* to avoid a contract by paying twenty thousand dollars, it is hardly appropriate to call that payment "damages." The written contract, therefore, does not indicate that the parties intended that seller's exclusive remedy in case of a breach would be a recovery of liquidated damages. Nothing appears to support the contention that the parties intended an alternative contract.[2]

But even if the government were correct that seller could not force the buyer to pay the purchase price, it does not follow that the contract was merely an "option." Once it is established, as above, that nonpayment by the buyer is a breach of the contract, the only sense in which the agreement is an option is in the same sense that every contract is an option—a promisor has the "option" between performing and not performing. Not performing, however, is unlawful. The fact that one of the parties to a contract has the "option" of pursuing an unlawful course of action does not make the contract an option in the sense for which the government is arguing. See 5A. CORBIN, CONTRACTS § 1070 (1950). Perhaps the government is here arguing that the contract lacked mutuality. But is there any question that a promise to convey Blackacre in return for a peppercorn is an enforceable promise? Plainly, therefore, the contract in question is a sales contract and not a mere option. Seller agreed to sell and did sell, while buyer agreed to pay the contract price. Nothing in paragraph 7 or elsewhere restricted the seller's remedies in case of a

breach or gave a buyer a right to avoid his promises.

The government has cited a number of decisions to support its option theory but none is apposite to the situation now before the court. In E. F. Baertschi, 49 T.C. 289 (1967), appeal pending, 6th Cir., the contract provided that in the event that the buyer did not pay the balance of the purchase price, the seller could (1) declare the balance due and enforce a vendor's lien or (2) rescind the contract and keep all prior payments. Thus the seller's recovery was limited to the money paid plus the value of the property and seller had no way to force the buyer to pay the full purchase price. In Commissioner of Internal Revenue v. Stuart, 300 F.2d 872 (3d Cir. 1962) the contract contained a clause which provided, should the buyer fail to make payments of the purchase price, that all sums paid to seller would be forfeited as liquidated damages, that buyer would be released from all obligation and liability including liability for specific performance, and that all rights of both parties would cease and determine. Thus, the court held, the buyer was not bound to perform. The agreement in Higgins Estate, Inc., 30 B.T.A. 814 (1934), provided that buyer could surrender the "option" and discontinue his payments in which case the agreement was to cease and determine. Seller, in that event, was to have no right to a recovery from buyer but could keep all prior payments as liquidated damages. Finally, in Parish-Watson & Co., Inc., 4 B.T.A. 605 (1926), the agreement permitted the buyer to "cancel" the contract at any time and receive back from the seller all prior payments. The buyer was bound, however, to pay the seller ten percent of the total contract price.

In all the decisions cited by the government, therefore, the contract itself placed limitations on the seller's right to recover the contract price from the buyer. In the instant case, the taxpayer unequivo-

---

2. As will be discussed *infra,* none of the evidence extrinsic to the written contract indicates that the parties intended an aternative contract or that they intended that seller's only remedy, in case of a breach by the buyer, would be the recovery of liquidated damages plus retention of the stock.

cally promised to pay the purchase price and there is nothing in the contract which limits the seller's remedies in case of a breach by the buyer.

Contracts very similar to the one at bar have been construed by the courts. Stewart v. Griffith, 217 U.S. 323, 30 S. Ct. 528, 54 L.Ed. 782 (1910), in particular, shows the inaccuracy of the government's analysis in the present case. In *Stewart*, the buyer paid five hundred dollars upon execution of an agreement for the sale of land. One-half of the balance was to be paid later in a lump sum and the second half was to be paid in five installments. The total price was approximately ten thousand dollars. The agreement provided "[i]n case * * * the first half of the purchase price be not paid on November 7, 1903, then the said $500 so paid to the [seller] is to be forfeited and the contract of sale and conveyance to be null and void, and of no effect in law * * *." *Id.* at 328, 30 S. Ct. at 529. One of the buyer's defenses to seller's suit for specific performance was that buyer had made no covenant and was free to withdraw if he chose to sacrifice his five hundred dollars. Until well after the time of Lord Coke, the Court noted, the only consequence of breaking the condition of a bond was an obligation to pay the penalty and the obligor was held to have an election between performing the condition and payment of the penalty. Eventually, however, at least under some circumstances, a bond would be construed as a promise to perform. The Court, however, did not find it necessary to resort to implication to find a promise on the part of the buyer because it appeared that the entire agreement imported mutual undertakings. The five hundred dollars was paid as "part purchase price of the total sum to be paid." The land was described as "being sold." The conclusion was that buyer had bound himself to take the land and pay the contract price.

> The condition plainly is for the benefit of the vendor, and hardly less plainly for his benefit alone, except so far as it may have fixed a time when [buyer]

might have called for performance * * *. This being so, the word "void" means voidable at the vendor's election, and the condition may be insisted upon or waived, at his choice. *Id.* at 329, 30 S.Ct. at 529.

Western Union Telegraph Co. v. Brown, 253 U.S. 101, 40 S.Ct. 460, 64 L. Ed. 803, (1920), involved an agreement to sell shares of stock. Seller agreed to sell and deliver to buyer, who agreed to buy, take, and receive the shares. The total price was seventy-five thousand dollars, of which ten per cent was paid at the execution of the agreement while the balance was to be paid in six bimonthly installments. Upon the payment of ten per cent, the seller was to endorse the shares in blank and deposit them in escrow. According to the escrow agreement, the escrow agent was to hold the shares until final payment by the buyer and was authorized to receive payments for the seller. The escrow agreement also stated that if buyer "defaults," all the stock plus all prior payments would belong to seller and all rights of each party would forever cease and terminate. The Court held that this was far more than a mere option to buy, terminable at the will of the buyer upon his failure to pay. There were positive provisions binding the seller to sell and the buyer to buy. There was no understanding that the seller should take back the stock if the payments were not made and there was no agreement which gave buyer the power to be relieved of his obligation by failing to pay. The right of seller to take back the stock was a provision inserted for seller's benefit of which the seller could avail himself or not, at his election.

And in Mound Mines Co. v. Hawthorne, 173 F. 882 (8th Cir. 1909), buyer made a one dollar down payment upon a contract for the sale of land for a price of five hundred dollars. The agreement provided that in the event the buyer failed to pay, the seller should be released from all obligations to convey the property and the buyer would forfeit all rights thereto. The court

held that this clause did not prevent the contract's being enforced. The contract was not an option but a contract of sale; seller agreed to sell and buyer agreed to buy. The buyer could enforce its performance upon tender of the price and seller could maintain an action for the purchase price. Although a contract gives a party the right to declare a forfeiture, the party may waive the right if he wishes.

Finally, both parties place great reliance upon Moore v. Commissioner of Internal Revenue, 124 F.2d 991 (7th Cir. 1941). The taxpayer and buyer executed a contract in which taxpayer "agrees to sell." It was provided that the buyer was not personally liable, was not required to pay the balance of the purchase price, and that taxpayer's only remedy in case buyer failed to pay was to take back the stock. The buyer's down payment was forty-three thousand, nine hundred four dollars and the total price was ninety-six thousand. Taxpayer endorsed the stock in blank and placed it in escrow. Taxpayer was to receive the interim dividends but was required to credit them against buyer's payments. The Commissioner took the position that the contract was merely an option that was not exercised until the buyer made the final payment. The court disagreed, although it conceded that the contract was similar to an option because the buyer was not obligated to pay the balance of the purchase price. The decisive factor, however, was that the buyer in fact had little choice but to make the payments because he had made such a large down payment, nearly fifty percent. The government here argues, since buyer's down payment of five thousand dollars plus the possible liquidated damages of twenty thousand dollars was such a small percentage of the purchase price of nearly one million dollars, that buyer in practical effect was under no strong compulsion to pay the contract price as was the buyer in Moore, so that the contract must be considered to be an option. But the contract in the present case is substantially different from the one in Moore. Even conceding, arguendo, that there is less economic coercion in the present case, there is legal compulsion that was absent in Moore. The buyer here expressly agreed to pay the purchase price and there is no clause in the contract which limits or restricts seller's remedies in case buyer breaches that agreement.

■ But even if the correctness of the government's interpretation of paragraph 7 of the May 9 agreement be conceded, arguendo,—that it clearly shows that paragraph 7 indicates an option, the result would be no different. If paragraph 7 clearly signals "option," since other parts of the agreement equally clearly signal "sale," the result would be the classically ambiguous contract. In that event, the only alternative would be to look beyond the four corners of the document of May 9 in order to ascertain the intention of the parties to resolve the ambiguity. That would not aid the government, however, because the evidence adduced at trial shows clearly that the parties intended to effect a sale and not an option by their written agreement of May 9, 1957. This evidence is discussed, infra.

■ The next question is when the sales contract of May 9, 1957, passed title to the stock to the taxpayer. The parties agree that if the May 9 contract gave the taxpayer the equitable title to the stock and that it gave taxpayer substantial contractual rights, then the holding period must be deemed to have begun on that day. In this case, it is clear that all the interest in the stock passed to the taxpayer on May 9, 1957, with the exception of bare legal title held by the seller as a security interest. This was sufficient to begin the taxpayer's holding period.

The contract provided that the seller "agrees to sell and does hereby sell" the stock to the taxpayer. Taxpayer agreed to pay for the stock and seller endorsed it and placed it in escrow. It had thus passed beyond his control, save for the happening of a condition

subsequent—failure of the buyer to give his promised performance. All these factors show that taxpayer had become the equitable owner of the stock. Moore v. Commissioner of Internal Revenue, 124 F.2d 991 (7th Cir. 1941); Swenson v. Commissioner of Internal Revenue, 309 F.2d 672, 7 A.L.R.3d 373 (8th Cir. 1962); Commissioner of Internal Revenue v. Union Pacific Co., 86 F.2d 637 (2d Cir. 1936); Ted F. Merrill, 40 T.C. 66 (1963); Commissioner of Internal Revenue v. Tyng, 106 F.2d 55 (2d Cir. 1939); C. M. Hall Lamp Co. v. United States, 201 F.2d 465 (6th Cir. 1953); Anderson-Thompson, Inc. v. Logan Grain Co., 238 F.2d 598 (10th Cir. 1956); Briggs v. United States, 143 U.S. 346, 12 S.Ct. 391, 36 L.Ed. 180 (1892). The fact that seller was to retain the July 1, 1957, dividend on the stock does not compel a different conclusion. This dividend may easily be considered as being in lieu of interest payments on the outstanding balance of the purchase price. Commissioner of Internal Revenue v. Tyng, 106 F.2d 55 (2d Cir. 1939).

■ At the trial of this cause, evidence was introduced to explain the background of the execution of the contract and to establish the government's contention that taxpayer was acting as the agent for an undisclosed principal. The six thousand shares of stock of the Peoples Life Insurance Company which taxpayer bought represented twenty percent of the outstanding shares of the corporation. Slightly more than a majority of the stock was held by a voting trust and, in 1953 or 1954, a dispute over management of the company arose between members of the voting trust. Two factions soon developed, the Smith faction which held a majority of the shares subject to the trust and the Ryan faction. The Smith faction apparently determined that the dispute was irreconcilable and decided to attempt to sell their stock. A friend suggested that Murchison Brothers of Dallas, Texas, might be potential buyers and the Smith group made contact with the Murchisons.

The Murchison Brothers had organized Life Companies, a corporation formed to be a holding company for life insurance companies and to enter the reinsurance business. Murchisons sent a Mr. Howard Sluyter to meet with the Smith group. Sluyter told them that Life Companies might be interested in purchasing Peoples Life but the Life Companies' policy was to acquire one hundred percent of the stock. Therefore, they would not be interested as long as a block of stock as large as Lyman E. Boyle's, the man from whom taxpayer bought, was outstanding. Sluyter suggested the Smith group attempt to find someone who could acquire Boyle's stock who would then be friendly to Life Companies. Then the chances that Life Companies and the Smith group could do business would be improved substantially.

It happens that Sluyter and taxpayer have been close personal friends for nearly forty years. Shortly after his meeting with the Smith group, Sluyter told taxpayer of the situation and suggested that taxpayer might find it a good investment. Sluyter said that Life Companies might be interested in buying the stock from taxpayer if he bought it but that taxpayer could probably make a good profit even if Life Companies did not buy.

As a result of this knowledge, taxpayer contacted Boyle in the fall of 1955. Boyle's stock, however, was involved in probate proceedings at the time so serious negotiations were delayed. By late 1956, however, Boyle's stock was cleared and negotiations, through meetings and phone calls, resumed. There was, though, additional delay because Boyle was undecided whether or not to sell, or to whom. Taxpayer admits that, throughout the negotiations, he was seeking an option from Boyle rather than an outright purchase.

As of the meeting of May 9, 1957, taxpayer still wanted an option. He went to the meeting armed with an op-

tion agreement prepared by his attorney plus a check for one thousand dollars, which he assumed would be a fair price for an option. But Boyle had finally decided that he would not grant an option but would only sell. He wanted to be rid of the stock. So taxpayer agreed to a sale and his attorney drafted the sales agreement during the lunch hour on May 9. His first draft of the sales agreement on May 9 included the first paragraph of paragraph 7. Boyle stated, however, that retention of only the five thousand dollars down payment as liquidated damages would not be sufficient but that he wanted at least twenty thousand dollars. The second paragraph was, therefore, drafted. The typist, however, did not understand that the second paragraph was to be a substitute for the first rather than an addition. The parties noticed this error but, instead of having the agreement retyped, inserted the handwritten words "in any event" in the first paragraph in an attempt to achieve smooth flow of language. The parties then read the entire contract and signed it. They did not, however, notice the discrepancy between the dates in paragraph 7. In all cases, December 9, 1957, rather than August 9, 1957, was correct.

Boyle arrived at his price of nine hundred sixty thousand dollars as a result of an intelligent and sophisticated analysis. It appears that he arrived at the liquidated damages figure of twenty thousand dollars through a similar method. In addition, he assumed, correctly as it turned out, that the price of life insurance company stocks in 1957 was constantly rising and that should there be a default and he took back the stock, the price increase plus the damages would adequately protect his interests. Boyle was also willing to accept a relatively small downpayment —one thousand dollars at time of execution and an additional four thousand dollars within ten days—for two reasons. First, taxpayer had only brought one thousand dollars with him to the meeting and Boyle did not wish to delay any

longer. Second, he did not want to make a large deposit to his bank account. Boyle resides in Frankfort, Indiana, a small town which apparently has a highly developed "grapevine." He did not want people to learn at that time that he had sold his stock. In fact, he did not even cash taxpayer's four thousand dollar check until after the closing in August. The reason that taxpayer was to pay the taxes, escrow charges, and Boyle's attorney's fees was that Boyle wanted the nine hundred sixty thousand to be net to him. As for the July 1 dividend, Boyle wanted it and could use it and taxpayer had no objection. It also would provide "interest" if the purchase price had not been paid by dividend time.

Soon after May 9, taxpayer reported to Sluyter that he had bought the stock and Life Companies proceeded in its attempts to acquire other Peoples stock. It is clear that Sluyter now felt that the stock was in "friendly" hands. Life Companies quickly bought most of the balance of the outstanding stock of Peoples Life and, on August 7, 1957, taxpayer gave Life Companies an option to buy his stock. On August 8, 1957, taxpayer borrowed one million dollars giving the stock as collateral and then paid Boyle the balance of the purchase price on August 9, 1957.

The loan was obtained by taxpayer from a bank in Philadelphia. Taxpayer dealt with one of the bank's vice-presidents and this man had been suggested to taxpayer by Sluyter. The bank vice-president was also a director of Life Companies and it appears that Life Companies entered into an arrangement to purchase the stock from the bank in the event of taxpayer's failure to repay the loan.

On the basis of these facts, the government argues that taxpayer was an agent for Life Companies, Sluyter, or the Murchison Brothers.

Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf

and subject to his control, and consent by the other so to act. The one for whom action is to be taken is the principal. The one who is to act is the agent.

Restatement (Second) of Agency § 1 (1958). Upon the evidence before the court, there was no agency between taxpayer and anyone.

It is clear that there was a great deal of similarity of interest between taxpayer and Life Companies or the Murchisons. As it happened, the actions taken by both benefited each other. Sluyter even assisted taxpayer in performing his contract with Boyle by aiding with the bank loan and it is possible, without the assistance of Sluyter, that taxpayer would have suffered a severe financial loss. These factors do not, however, make the taxpayer an agent.

There is no evidence that taxpayer ever *agreed* to act on behalf of Life Companies or the Murchison Brothers. He was informed of an investment opportunity which would perhaps benefit them both but the reason he acted was to further his own financial interests, not to act as agent for Life Companies. Neither is there any evidence that Murchisons or Sluyter consented that taxpayer should act on their behalf. He had no authority to bind them. They never promised taxpayer that they would buy the stock from him should he buy it from Boyle or that they would proceed with the acquisition of Peoples Life. It appears that the Murchison Brothers did not, nor did they need to, actively seek companies they could acquire. In 1957, more people approached them with offers to sell life insurance companies than they could possibly accept. For the Murchisons, it was a buyer's market. Their view of Peoples was that, if a purchase worked out, fine; if it did not, that too was acceptable. Their position was in a real sense one of indifference. It further appears that their assistance in getting a loan for the taxpayer came only after they had been successful in buying most of the balance of the Peoples stock. There is no evidence whatever that they would have given this assistance had their purchase of Peoples not developed. Finally there is no evidence that anyone had any power to control the taxpayer or that anyone even attempted to do so. The existence of an agency is not established by the evidence.

The evidence also supports the court's construction of the agreement of May 9, 1957. Although taxpayer had hoped for an option, Boyle would only sell. Taxpayer was admittedly disappointed and admittedly incurred the great risk that he would not be able to sell the stock before he was required to make his final payments to Boyle. But taxpayer decided to agree to Boyle's terms. Furthermore, Boyle wanted a complete sale because he wanted to be rid of the stock. There is absolutely no evidence that there was any understanding that Boyle could not sue taxpayer for the purchase price in case taxpayer breached his express promise to pay for the stock. Boyle wanted a sale as of May 9, 1957, taxpayer agreed, and that is exactly what the contract signed by the parties accomplished. The parties intended to enter into a sales agreement and not an option or alternative contract.

In its post-trial brief, the government raises an additional argument which it now makes for the first time in this litigation. That argument is that taxpayer *sold* the stock on August 7, 1957, so that, even if the court holds that the stock was bought on May 9, 1957, taxpayer did not hold the stock for the six months required to receive long term capital gains treatment. This argument is completely devoid of merit. In the first place, this contention directly controverts the stipulation of the parties contained in the pretrial order that "[o]n November 13, 1957, Fletcher sold said stock to Lico Corporation upon exercise by it of an option previously given by said Fletcher." In the second place, the argument is supported by neither the law nor the facts.

The court finds, therefore, that taxpayer's gain from the sale of stock of

Peoples Life Insurance Company on November 13, 1957, is long term capital gain and that taxpayer, in buying and selling this stock, was acting in his own behalf.

The parties have not submitted specific calculations from which the precise amount taxpayer is entitled to recover can be ascertained. The parties are directed to submit a proposed form of judgment and the basic method of calculation used in arriving at the amount of the judgment. If the parties cannot agree, each shall submit a proposed form of judgment and underlying calculations as to amount no later than June 30, 1969.

This memorandum of decision contains the court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

## APPENDIX

### PURCHASE AND SALE AGREEMENT

This agreement made and entered into this 9th day of May, 1957, by and between Lyman Boyle of Frankfort, Indiana, hereinafter referred to as "Boyle", and Sam W. Fletcher of Fort Wayne, Indiana, hereinafter referred to as "Fletcher", WITNESSETH:

That the said Boyle agrees to sell and does hereby sell to the said Fletcher all his right, title and interest in and to six thousand shares of the common capital stock, hereinafter referred to as "stock" of the Peoples Life Insurance Company of Frankfort, Indiana, upon the following terms and conditions, to-wit:

1. That the said Fletcher hereby agrees to pay to the said Boyle for said stock the sum of Nine Hundred Sixty Thousand Dollars ($960,000.00) as follows: One Thousand Dollars ($1,000.00) cash in hand, the receipt whereof is hereby acknowledged, and an additional sum of Four Thousand Dollars ($4,000.-00) on or before ten (10) days from date, and the balance to-wit, Nine Hundred Fifty-Five Thousand Dollars ($955,-000.00) on or before the 9th day of December, 1957, and upon the delivery of said stock to the said Fletcher.

2. Since dividends will accrue and be payable upon this stock about July 1, 1957, it is understood between the parties that if the full consideration for said stock is paid prior to the payment of said dividend on or before July 1, 1957, then said dividend shall be the property of said Fletcher and shall be paid to him, and in the event that the full consideration for the purchase of said stock is not paid to the said Boyle until after the said date of July 1, 1957, then the said dividend shall be the property of Boyle and be payable to him and he shall have the right to retain said dividend.

3. Concurrently herewith, and within a reasonable time from date, the said Boyle agrees to deposit the Certificates evidencing and representing all the shares of the stock duly endorsed in blank or with blank stock powers duly executed attached with signatures properly executed in the presence of the said Fletcher and escrow agent, in escrow with the Indiana National Bank of Indianapolis or any other comparable National Bank in the State of Indiana as Escrow Agent, this form of escrow agreement to be mutually satisfactory to Fletcher and said Escrow Agent; and said Escrow Agent is hereby requested and directed to hold said Certificates in escrow until said purchase price hereinabove set forth is paid in full, consistent with the terms of this agreement, at which time said Certificates shall be delivered to the said Fletcher or his assigns. Fees and expenses of the Escrow Agent shall be paid by the said Fletcher.

4. In the event the said parties to this agreement have performed consistent with the provisions of this agreement then at the date of closing the following actions shall take place simultaneously:

A. Boyle shall deliver or cause to be delivered to Fletcher, or his assigns the stock and all Certificates and any other rights and warrants hereinabove provided to go with the stock to

Fletcher; and by such delivery Boyle shall be deemed to have warranted to Fletcher or his assigns; that he has full right and authority to sell, assign and transfer free and clear of any liens, charges or encumbrances and that there are not any unpaid taxes which have been assessed against the stock which are or could become a lien superior to the said transferred title upon the purchase of said stock.

B. Fletcher or his assigns shall pay to, or to the order of, Boyle the purchase price of the stock.

5. All Federal and State Documentary and stock transfer taxes payable in connection with the execution of this agreement and in connection with the transfer of this stock shall be borne by Fletcher.

6. It is mutually agreed between the parties that Ben M. Scifres, attorney for Boyle, shall be paid the sum of Fifteen Thousand Dollars ($15,000.00) by the said Fletcher in consideration for his services rendered, at the consumation of the sale, vis. delivery of the stock to the said Fletcher.

7. It is further mutually agreed between the parties that in the event the said Fletcher is unable to pay the balance of the purchase price on or before August 9, 1957, or for any other reason defaults and so informs by registered letter the said Boyle this contract will then be considered null and void. And it is understood by and between the parties that in the event of the death of the said Fletcher on or before August 9, 1957, and his personal representative cannot carry out the terms of this contract then said personal representative shall notify the said Boyle by registered mail that said contract will not be fulfilled by reason of the death of the said Fletcher, and in any event, the amounts heretofore paid to the said Boyle as part of the purchase price herein shall be retained by him as liquidated damages.

In the event the said Fletcher does not complete the purchase of said stock on or before December 9, 1957, consistent with the terms of the within agreement, then and in that event the said Fletcher will pay to the said Boyle the additional sum of Twenty Thousand Dollars ($20,000.00), which sum is agreed upon between the parties, as liquidated damages and this contract will then become null and void and of no force and effect.

8. This agreement shall be binding upon and extend and inure to the benefit of the parties hereto and their respective heirs, legal representatives and assigns.

In Witness hereto the parties have hereunto set their hands this 9th day of May, 1957.